34 S.W.3d 625 (2000)
In the Interest of D.T., A Child.
No. 2-99-101-CV.
Court of Appeals of Texas, Fort Worth.
November 16, 2000.
Rehearing Overruled January 25, 2001.
*627 Mike Berger, Fort Worth, for appellant.
Tim Curry, Crim. Dist. Atty., Charles M. Mallin, Chief Appellate Division, Helena F. Faulkner, Asst. Dist. Atty., Fort Worth, for appellee.
DAY and GARDNER, JJ.; JOHN HILL, J. (Retired, Sitting by Assignment).

OPINION ON REHEARING
ANNE GARDNER, Justice.
The State, on behalf of Texas Department of Protective and Regulatory Services (TDPRS), has filed a combined motion for rehearing and motion for rehearing en banc asserting complaints regarding our original decision. We withdraw our opinion and judgment issued June 8, 2000, and substitute the following *628 in their place. We overrule the motion for rehearing.

INTRODUCTION
Appellant L.J.T., a twenty-eight year old mother,[1] appeals from the trial court's judgment terminating her parental rights to her son, D.T. She raises two points, contending there is legally or factually insufficient evidence to support the judgment of termination. We reverse and render in part and reverse and remand in part.

BACKGROUND
Appellant became pregnant with D.T. in 1996, while living in Montana with D.T.'s father, D.B.[2] She left Montana on November 12, 1996, because D.B. had struck her with a bicycle rack the night before and because she wanted to avoid serving a jail term for a bad check charge. She moved to Oklahoma and had no further contact with D.B.
Appellant lived in Oklahoma from November 1996 until September 1997. D.T. was born in Oklahoma City on August 12, 1997. Subsequently, Appellant moved to Texas, got a job, and arranged for a babysitter to care for D.T. On February 10, 1998, Appellant was arrested by the Hurst Police Department on warrants for bad checks written in Texas and Montana. After she was arrested, she made arrangements for the babysitter to continue caring for D.T. for several more days. D.T. was then six months old.
Because she had no family locally, Appellant requested that TDPRS contact the child's paternal grandparents for possible placement.[3] D.T. was placed in emergency foster care on February 12, 1998.
Jennifer Cook of TDPRS was assigned the case on February 12, 1998. She went to the Hurst jail and met with Appellant for approximately thirty to forty-five minutes. Cook notified Appellant of the emergency placement of D.T. and told her about proceedings being initiated by TDPRS to terminate the parent-child relationship between Appellant and D.T.
Cook saw D.T. on the date she was assigned, and the child appeared to be healthy and well-nourished. At that time, she had no reason to believe that D.T. was abused or neglected. In Cook's words, D.T. "was clean, he looked very healthy. He was real healthy, happy, smiling." Cook felt the reason an emergency removal was necessary was because Appellant could not make bond and there were no available relatives with whom to place D.T. Had Appellant been able to make bond, Cook said Appellant would have been in a position to make arrangements on her own to take care of her son.
On March 5, 1998, Cook called Appellant and spoke with her about relinquishing her parental rights. Appellant told Cook that she thought she would be in jail for over twelve months. Cook explained that in every case in which she "feels" a jail term may exceed twelve months, she is instructed to look at relinquishment from "day one." Nevertheless, Cook testified that there was a two-track approach to the case, in which the caseworkers were pursuing both reunification and termination. The case was transferred sometime in March 1998 to Noelle Preston, a caseworker at TDPRS, for the making of a service plan.
On March 12, 1998, Preston developed a family service plan with a long-range goal of family reunification and mailed it to Appellant. The service plan required Appellant *629 to attend parenting classes and counseling, obtain psychological testing, and participate in parole stipulations when applicable.
On March 20, 1998, Appellant wrote Preston and advised her that she had tried to telephone Preston; she asked how D.T. was doing. On six more occasions between June and December 1998, Appellant wrote Preston, asking how D.T. was doing, asking for pictures of him, and requesting visits with D.T. while she was incarcerated. In an October 6 letter, she advised Preston that she did not want D.T. placed for adoption, that she wanted her son, and that she wanted his paternal grandparents to take care of him while she was incarcerated. Appellant advised Preston that she had completed parenting classes and was currently in counseling. It is undisputed that visits between Appellant and her son were denied, based solely on TDPRS "policy": Appellant had been transferred out of the region where her son had been placed and such visits are deemed not to be in the child's best interest.
On June 3, 1998, Preston sent Appellant a letter stating in relevant part:
I have not heard from you for quite some time now. I need for you to call me ... or send me a letter by June 9, 1998, so we can discuss your service plan. I am reviewing your last plan, dated 3/12/98, since there will be a review court hearing scheduled in July and your plan must be updated for the hearing. You will receive notice of the hearing in a few weeks.
If I do not hear from you by June 9th I will complete your service plan without your participation and mail you a copy. However, your participation is crucial, therefore, we really need to talk.
I am changing the permanency goal from "family reunification" to "adoption." We can talk more about that when you call or write.
Preston confirmed that TDPRS would not have taken the child but for the fact that Appellant was incarcerated. Preston also admitted that Appellant did everything she could while in jail to comply with the service plan. Appellant was scheduled to be released in August 1999, but Preston testified that she believed Appellant's parental rights should be terminated because she had engaged in criminal conduct that resulted in her separation from D.T. by her imprisonment, thereby endangering D.T.'s well-being.
The termination hearing was held on January 21, 1999. Judgment was rendered terminating Appellant's parental rights, as well as those of D.B. and Appellant's former husband as putative father. The trial court signed a corrected decree on April 23, 1999, and filed findings of fact and conclusions of law.

TERMINATION OF PARENTAL RIGHTS
In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex.Fam.Code Ann. § 161.001(1), (2) (Vernon Supp.2000); Richardson v. Green, 677 S.W.2d 497, 499 (Tex.1984). Proof of one does not relieve the petitioner from establishing the other. Holley v. Adams, 544 S.W.2d 367, 370 (Tex.1976). It must be emphasized that the child's best interest is not the sole goal of involuntary termination proceedings. The supreme court has made clear that termination "may not be based solely upon what the trial court determines to be the best interest of the child." Id. (emphasis added).
Parents' rights to "the companionship, care, custody and management" of their children are protected to the degree that they are of "federal constitutional dimensions." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (holding that the parent-child relationship is "far more precious than any property right"). In a termination case, *630 the State seeks not merely to limit those rights but to end them finally and irrevocablyto divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex.Fam.Code Ann. § 161.206(b) (Vernon 1996); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985).
It is because termination of parental rights is such a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by a heightened burden of proof of "clear and convincing evidence." In re G.M., 596 S.W.2d 846, 847 (Tex.1980); See also Tex.Fam.Code Ann. § 161.206(a). This burden is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex.Fam.Code Ann. § 101.007 (Vernon 1996); Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 31 (Tex.1994). This is an intermediate standard that falls between the preponderance burden of ordinary civil proceedings and the reasonable doubt burden of criminal proceedings. State v. Addington, 588 S.W.2d 569, 570 (Tex.1979).
The clear and convincing standard of proof creates a higher burden to fulfill because of the severity and permanency of the termination of the parent and child relationship. In re J.N.R., 982 S.W.2d 137, 141 (Tex.App.-Houston [1st Dist.] 1998, no pet.). This court is duty bound to strictly scrutinize termination proceedings and must strictly construe involuntary termination statutes in favor of the parent. Holick, 685 S.W.2d at 20-21; In re A.V., 849 S.W.2d 393, 400 (Tex.App.-Fort Worth 1993, no writ).

STANDARD OF REVIEW
Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. Anderson v. City of Seven Points, 806 S.W.2d 791, 794 (Tex.1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex.1996); Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex.1994).
When presented with legal and factual sufficiency challenges, the reviewing court first reviews the legal sufficiency of the evidence. Glover v. Texas Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex.1981) (per curiam). In determining a "no-evidence" point, we are to consider all of the evidence in the light most favorable to the party in whose favor the judgment has been rendered, and to indulge every reasonable inference from the evidence in that party's favor. Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex.1998) (op. on reh'g); Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.1997), cert. denied, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).
An assertion that the evidence is "factually insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination. Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406 (Tex.), cert. denied, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).
We have previously held that the higher burden of proof in termination cases does not alter the appellate standard of review for factual sufficiency of the evidence. In re W.S., 899 S.W.2d 772, 776 (Tex.App.-Fort Worth, 1995, no writ); Faram v. Gervitz-Faram, 895 S.W.2d 839, 843 (Tex.App.-Fort Worth, 1995, no writ). A number of our sister courts have likewise continued to apply the traditional *631 standard of review for factual sufficiency where the burden in the trial court is clear and convincing evidence.[4] We note that other courts have espoused what they describe as an intermediate standard of appellate review of factual sufficiency of the evidence in such cases.[5]
In In re L.R.M., this court recognized that, just as the clear and convincing standard of proof in the trial court is an "intermediate" standard of proof falling between the preponderance of evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings, the standard of review for clear and convincing evidence is an "intermediate" standard necessary to protect the fundamental constitutional rights of the parent in termination proceedings. 763 S.W.2d 64, 67 (Tex.App.-Fort Worth 1989, no writ). However, we further observed that, in applying the intermediate standard of review, "[o]ther principles of law relating to sufficiency of evidence are still applicable even when the intermediate standard is used." Id.
Those other principles include the well-settled rule that, in reviewing the factual sufficiency of evidence, we must consider and weigh all of the evidence just as the trial court did, including that favorable to the appellant as well as that favorable to the verdict or findings of the court. Ortiz, 917 S.W.2d at 772 (holding court of appeals must "weigh all of the evidence in the record"); Lofton v. Texas Brine Corp., 720 S.W.2d 804, 805 (Tex.1986) (noting that court of appeals must examine entire record and review all of the evidence); In re King's Estate, 150 Tex. at 664-65, 244 S.W.2d at 661 (pointing out that fact jurisdiction under article V, section 6 of the Texas Constitution requires exercise of our "peculiar" powers to consider and weigh all of the evidence).
The reviewing court does not "indulge inferences or confine its view to evidence favoring one side of the case. Rather, it looks at all of the evidence and then makes a predominately intuitive judgement." William Powers & Jack Ratliff, Another Look at "No Evidence" and "Insufficient Evidence" 69 Tex.L.Rev. 515, 525 (1991). The courts of appeals "must, up to a point, follow the same mental processes as a jury does." St. John Garwood, The Question of Insufficient Evidence on Appeal, 30 Tex. L.Rev. 803, 811 (1952).
We recognize that we are not a fact finder and that we cannot substitute our judgment for that of the jury merely because the evidence would support a different result. Maritime Overseas, 971 S.W.2d at 406. We can only "unfind" facts. Pool v. Ford Motor Co., 715 S.W.2d 629, 634 (Tex.1986) (quoting Garwood, 30 Tex.L.Rev. at 813-14). Further, we may set aside a verdict or finding only if the evidence is so weak or the verdict or findings are so contrary to the overwhelming weight of the evidence as to be manifestly unjust. Ortiz, 917 S.W.2d at 772; Pool, 715 S.W.2d at 634.
Applying these principles in reviewing factual sufficiency of the evidence *632 where a "clear and convincing" burden of proof is required, the standard of review actually does not change, regardless of the terminology used to describe it.[6] Rather, the higher burden of proof merely changes the weight of the evidence necessary to support a finding or verdict. Review of factual sufficiency of the evidence under a clear and convincing standard requires us to determine whether the evidence is sufficient to make the existence of the fact highly probable, not whether the evidence supporting the finding is sufficient to make the existence of the fact more probable than not, as in ordinary civil cases. That is, we must consider whether the evidence is sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. In re B.R., 950 S.W.2d 113, 119 (Tex.App.-El Paso 1997, no writ); Faram, 895 S.W.2d at 843. Accordingly, to prevail on an assertion that the evidence supporting termination of parental rights is factually insufficient, the appellant must show that the evidence is so weak or the evidence to the contrary is so overwhelming that the trier of fact could not have reasonably concluded that there was a high probability that the conduct or endangerment of the child occurred or that termination was in the best interest of the child.

TRIAL COURT'S FINDINGS
The trial court found, specifically, that Appellant had arrest warrants in five states based on her criminal conduct prior to the birth of D.T.; that Appellant knew her criminal conduct was wrong and could result in her incarceration and inability to parent her child; that Appellant again engaged in criminal conduct after D.T.'s birth and was incarcerated; and that Appellant's conduct and subsequent incarceration endangered the physical and emotional well-being of D.T.
The trial court made the following findings based on the statutory requirements of section 161.001: Appellant knowingly placed D.T. and allowed him to remain in conditions and surroundings that endangered his physical and emotional well-being; Appellant engaged in conduct and knowingly placed D.T. with persons who engaged in conduct that endangered his physical and emotional well-being; Appellant constructively abandoned D.T., who had been in the temporary managing conservatorship of TDPRS for not less than six months, and (a) TDPRS made reasonable efforts to return D.T. to Appellant, (b) Appellant did not regularly visit or maintain significant contact with D.T., and (c) Appellant has demonstrated an inability to provide D.T. with a safe environment; and termination of Appellant's parental rights is in D.T.'s best interest.[7]

LEGAL SUFFICIENCY OF THE EVIDENCE

I. Environment
We first address whether the evidence is legally sufficient to support the finding that Appellant knowingly placed and knowingly allowed D.T. to remain in conditions or surroundings that endangered his physical or emotional well-being. Tex.Fam.Code Ann. § 161.001(1)(D). Under section 161.001(1)(D), the environment of the child must be examined to determine if that is a source of endangerment to the child. Id.; In re B.S.T., 977 S.W.2d at 484. There is no evidence regarding D.T.'s home environment prior to Appellant's arrest. There is no indication that *633 the babysitter's residence was a dangerous environment.
In In re W.S., we held that involuntary termination under former section 15.02(a)(1)(D) of the Texas Family Code[8] may be established by conduct of the parent as well as by physical conditions in the home. 899 S.W.2d at 776. The State now urges that, under our holding in that case, the conduct and incarceration of Appellant somehow suffices to establish a basis for termination under section 161.001(D). W.S. involved a child continually subjected to sexual abuse by the stepfather in the home, with no effort by the mother to stop the abuse even though she was aware of its occurrence. On that evidence, we held that an endangering "environment" may be produced by conduct of the parent in the home. Id.
This case bears no likeness to W.S. When Appellant was arrested, she asked that TDPRS be contacted to ensure that D.T. was cared for while she was in jail. There was no indication at the time D.T. was placed in foster care that he had been abused or neglected; he appeared clean, happy, and healthy.[9] Cook admitted that, if Appellant had made bond, she would have been able to continue caring for her son. We determine that there is no evidence that Appellant knowingly placed or allowed the child to remain in conditions that endangered his physical or emotional well-being.

II. Constructive Abandonment
We next address whether the evidence was legally sufficient to support the finding that Appellant constructively abandoned D.T. Tex.Fam.Code Ann. § 161.001(1)(N). The elements of constructive abandonment are: (1) the child has been in the permanent or temporary managing conservatorship of TDPRS for not less than six months; (2) the department has made reasonable efforts to return the child to the parent; (3) the parent has not regularly visited or maintained significant contact with the child; and (4) the parent has demonstrated an inability to provide the child with a safe environment. Id. If there is no evidence of one or more of these elements, then the finding of constructive abandonment fails.
The first element is not disputed, and the second is inapplicable because Appellant was incarcerated. Therefore, we will focus on the third and fourth elements. There is no evidence to establish the third element of constructive abandonment. To the contrary, Appellant made numerous written requests asking for visitation while she was in jail. Appellant testified that Preston told her that she was going to visit her in Polk County, but when Appellant asked her to bring D.T., Preston stated that the judge would not allow it. Preston confirmed that visitations were denied based on the policy of TDPRS. The record does not support the trial court's finding that Appellant did not attempt to visit regularly or maintain significant contact with the child.
Turning to the last element, nothing in the record other than her incarceration indicates that Appellant has demonstrated an inability to provide D.T. with a safe environment. It has long been settled that imprisonment, standing alone, does not constitute "abandonment" of a child for purposes of termination of parental rights. In re S.D.H., 591 S.W.2d 637, 638 (Tex.Civ. App.-Eastland 1979, no writ) (holding imprisonment does not constitute "abandonment," nor is it conduct "endangering" a child); H.W.J. v. State Dep't of Public *634 Welfare, 543 S.W.2d 9, 11 (Tex.Civ.App.-Texarkana 1976, no writ) (same); Hutson v. Haggard, 475 S.W.2d 330, 333 (Tex.Civ. App.-Beaumont 1971, no writ) (holding imprisonment is not "abandonment"). Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987) (holding imprisonment alone is not conduct "endangering a child").
Considering the evidence in light of the proper standard for "no-evidence" review, and mindful that incarceration alone is not sufficient to constitute abandonment of a child, we hold there is no evidence to support two of the required elements of constructive abandonment.

III. Course of Conduct
We next address the legal sufficiency of the evidence to support the trial court's finding that Appellant engaged in conduct or knowingly placed D.T. with persons who engaged in conduct that endangered his physical or emotional well-being. Tex.Fam.Code Ann. § 161.001(1)(E). Section 161.001(1)(E) requires us to look at the parent's conduct alone, including actions or omissions or failures to act. Id.; In re B.S.T., 977 S.W.2d at 484.
"Endanger" under section 161.001(1)(E) means to expose to loss or injury, to jeopardize. Boyd, 727 S.W.2d at 533. The term means more than a threat of "metaphysical injury," but it is not necessary that the conduct be directed at the child or that the child actually suffer injury. Id. Nevertheless, there must be evidence of endangerment to the child's physical or emotional well-being as the direct result of the parent's conduct. In re R.D., 955 S.W.2d 364, 366 (Tex.App.-San Antonio 1997, pet. denied); Dupree v. Texas Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 83-84 (Tex.App.-Dallas 1995, no writ).
Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious "course of conduct" by the parent is required. In re K.M.M., 993 S.W.2d 225, 228 (Tex.App.-Eastland 1999, no pet.); In re J.N.R., 982 S.W.2d at 142. There is evidence that Appellant had prior convictions and outstanding arrest warrants based on criminal conduct of writing bad checks before D.T.'s birth. Appellant had previously lived in various states outside of Texas. Appellant admitted that, while living in Utah several years before moving to Texas, she had received probation for two bad check cases, one felony and one misdemeanor. Appellant also acknowledged that she jumped bond when she fled from Montana in 1996 prior to D.T.'s birth, partly to avoid serving time in jail. Child protective services became involved, and the two children she had at that time were placed with her mother.[10] Appellant testified she had outstanding warrants from the state of Montana as the result of the revocation of her bond and as a result of the bad check charge pending there.
The evidence to support the trial court's specific finding that Appellant had arrest warrants in five different states consisted of testimony from caseworker Preston that Appellant had told her she had "holds" on her from two other states, Idaho and Oklahoma, in addition to the Montana charges and the convictions in Utah. Appellant testified at the hearing that she was given that information by "Polk County," but some of those "cases" were several years old and she had no information that those states were looking for her or had "holds" on her. She was to *635 be released in August 1999 from her current sentence unless one of those states took her on her release date. Caseworker Cook testified only that TDPRS had been "given information regarding her criminal history and [was] concern[ed] that [Appellant] had several warrants out in several different states and her jail term might go beyond the twelfth month." Preston testified Appellant's course of criminal conduct resulted in her imprisonment, thereby endangering D.T.'s physical and emotional well-being by causing Appellant to be separated from him. The argument of TDPRS, apparently accepted by the trial court, is that Appellant knew she was engaging in conduct that could result in her imprisonment and separation from D.T. and, accordingly, by actively writing bad checks, she engaged in a voluntary, deliberate, and conscious course of conduct that endangered D.T. We reject this argument, as it would effectively nullify the longstanding rule against terminating the parental relationship based solely on imprisonment. Boyd, 727 S.W.2d at 533.
In Boyd, the evidence showed that the father had been convicted of two burglaries, was imprisoned when the child was born, lived with the mother and child for six months, and was in prison again at the time of the hearing. Id. at 533. The Supreme Court of Texas held "endanger" means more than a threat of metaphysical injury or the possibility of ill effects, and endangerment does not require that the misconduct of the parent be directed at the child or that the child actually suffer injury. Id. Rather, the court concluded, "endanger" means "to expose to loss or injury," and "imprisonment is certainly a factor to be considered ... on the issue of endangerment." Id.
The court acknowledged that Texas cases have held that mere imprisonment, standing alone, will not constitute engaging in conduct that endangers the emotional or physical well-being of the child, but noted that the courts have "parted company" on the effect of the parents' imprisonment. Id. The court then held, without elaboration, "[i]f the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under Section 15.02(1)(E) is supportable." Id. at 534 (quoting Wray v. Lenderman, 640 S.W.2d 68, 71 (Tex. App.-Tyler 1982)).
In the court of appeals in Boyd, the Department of Human Services had made the identical argument asserted in our case: "endangerment" as contemplated by the statute may be inferred from imprisonment, alone, when such imprisonment is the result of a voluntary, deliberate and conscious course of conduct by the prisoner. Boyd v. Texas Dep't of Human Servs., 715 S.W.2d 711, 717 (Tex.App.-Austin 1986), rev'd, 727 S.W.2d 531 (Tex.1987). The Austin court of appeals expressly rejected that argument, describing it as "fundamentally without meaning." Id. That court pointed out:
By definition, almost all crimes for which imprisonment may be assessed require a culpable mental state that is voluntary, deliberate and conscious.... [I]nstead of "qualifying" the primary rule, that imprisonment and criminal conduct are not, in and of themselves, grounds for the termination of parental rights, the rule for which the Department contends would devour or render meaningless such primary rule....
Id. at 716.
In reversing, the supreme court disapproved the court of appeals' holding that endangerment may not be inferred from conduct of a parent and must be proved by independent evidence. The supreme court also said that imprisonment is a "factor" to consider with other evidence. The supreme court did not say that endangerment may be inferred from any and all criminal conduct just because that conduct results in imprisonment.
Notably, in reversing the court of appeals' decision in Boyd, the supreme court *636 did not mention the court of appeals' rejection of the Department's argument.[11] We do not read the supreme court's decision in Boyd as requiring us to accept TDPRS's argument that, merely because a parent voluntarily, willfully, and consciously engages in conduct that she knows may result in imprisonment, such conduct and resulting imprisonment are sufficient to support termination of her parental rights. We believe more is required to meet the stringent conditions that are necessary to terminate parental rights.
While an easily administered test such as that proposed by TDPRS may serve the State's interest in conserving time and administrative resources, such a test creates a danger that termination of parental rights could become an additional punishment automatically imposed along with imprisonment for almost any crime. Steven Fleischer, Termination of Parental Rights: An Additional Sentence for Incarcerated Parents, 29 SETON HALL L.REV. 312, 313-16, 339-40 (1998).
On the other hand, the supreme court has not articulated how and to what extent imprisonment should be considered as a "factor" in termination cases. Since Boyd, one court has suggested that imprisonment is a factor in termination only if it is the result of or coupled with a course of conduct that, itself, causes endangerment to the physical or emotional well-being of the child. Dupree, 907 S.W.2d at 84. Another court has stated that if imprisonment is based upon "a certain type of voluntary, deliberate and conscious course of conduct," only then may imprisonment be considered conduct that "endangers" the child under section 161.001(1)(D) or (E). In re K.M.M., 993 S.W.2d at 228.
In the cases we have found involving termination of parental rights of imprisoned parents, endangerment to a child could easily have been inferred from the underlying conduct of the parent. E.g., In re M.D.S., 1 S.W.3d 190, 198-99 (Tex. App.-Amarillo 1999, no pet.) (affirming termination of parental rights of father serving sentence for burglary based on negotiated plea with dismissal of indictment for aggravated sexual assault of another child and history of multiple sexual encounters with children); In re K.M.M., 993 S.W.2d at 228 (finding evidence of "endangerment" sufficient where father was incarcerated before child's birth for sexual assault of fifteen-month old child, had three previous juvenile adjudications for aggravated sexual assault of children, and was still incarcerated at time of trial); Spangler, 962 S.W.2d at 260 (upholding termination of parental rights of father who was serving sentence for "retaliation" against TDPRS worker, who was frequently in jail, and abused mother in presence of children); In re J.J., 911 S.W.2d at 440 (affirming termination of parental rights of father who was frequently jailed, used crack cocaine, and abused wife in presence of children); Trevino v. Texas Dep't of Protective & Regulatory Servs., 893 S.W.2d 243, 247-48 (Tex.App.-Austin 1995, no writ) (affirming termination of parental rights of father who frequently used drugs and was imprisoned for causing death of another child); In re A.K.S., 736 S.W.2d 145, 146 (Tex.App.-Beaumont 1987, no writ) (affirming termination of parental rights of father serving sentence for rape, who also compulsively exhibited genitals to women). Termination based on conduct resulting in imprisonment has also been upheld in one case involving a series of arrests and imprisonments along with additional criminal conduct by the parent with knowledge that his rights to the child were in jeopardy. In re J.N.R., 982 S.W.2d at 144.
There is no evidence here that Appellant's misconduct in writing bad checks was of a type from which endangerment could be inferred. Nevertheless, evidence *637 of conduct before a child is born, as well as evidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under section 161.001(1)(E) has been established. E.g., In re D.L.N., 958 S.W.2d 934, 939 (Tex.App.-Waco 1997, pet. denied); see also Dupree, 907 S.W.2d at 84; Trevino, 893 S.W.2d at 248. We hold that the evidence of Appellant's past course of misconduct, including the evidence that she left her other two children in foster care in Montana when she jumped bail, together with her subsequent offense in Texas and incarceration, viewed in a light most favorable to the judgment, is some evidence of a course of conduct of endangerment under section 161.001(1)(E).

FACTUAL SUFFICIENCY OF THE EVIDENCE
To determine whether the evidence is factually insufficient, we consider and detail all the evidence relevant to the trial court's finding under section 161.001(1)(E). See Pool, 715 S.W.2d at 635. Specifically, the issue is whether all of the evidence, including the evidence of Appellant's imprisonment, is factually sufficient to establish that she endangered D.T. physically or emotionally.

I. Evidence Supporting the Finding
In reviewing the legal sufficiency of the evidence, we have previously reviewed and detailed the evidence supporting the finding of endangerment as the result of Appellant's course of conduct. Briefly summarizing: Appellant (1) fled the State of Montana while pregnant to avoid imprisonment for writing a hot check, leaving her other children who were later placed with her mother; (2) wrote one or more bad checks in Texas after D.T. was born, resulting in her imprisonment for approximately eighteen months; and (3) engaged in similar criminal conduct in other states prior to D.T.'s birth.
Neither Cook nor Preston verified with the Texas Department of Corrections Appellant's scheduled release date or her criminal status with the other states. Preston amended the service plan based on a telephone conversation she had in June 1998 with authorities in Livingston in which she was told that Appellant would be in jail two years and would then be bench warranted to other states. On cross-examination, Preston conceded that information was incorrect.
Appellant testified that she knew her conduct was wrong and that she could possibly go to jail but that she did not know her ability to parent D.T. could be affected. In In re J.N.R., a biological father learned of his child while in prison, made monthly inquiries regarding the child until his release despite the filing of the termination suit, and thereafter became an active parent in the child's life with regularly scheduled visits and participation in a family service plan. 982 S.W.2d at 139. The plan required him to secure a job and a place to stay, which he did, and also required him to stay out of jail and participate in his parole tasks, which he did not do. Within a few months, his participation in parenting classes became very inconsistent. He also failed to show up for drug tests, and within a period of one month, he was arrested on three separate occasions for disorderly conduct, passing counterfeit bills, and resisting arrest. At the time of the termination hearing, he was in jail awaiting trial on still another charge of passing counterfeit bills. Affirming a judgment terminating his parental rights, the court of appeals relied upon evidence that the father had continued to engage in the criminal activity that resulted in his incarceration even after knowing his parental rights were in jeopardy. Id. at 143. In contrast to the record in In re J.N.R., there is no evidence here that Appellant knew her conduct would result in long-term imprisonment that would affect her ability to parent D.T. or that would have the effect of endangering D.T.'s physical or emotional well-being. What remains is the evidence that Appellant fled Montana, leaving her other children *638 who were placed in foster care. However, the record is silent as to any factual details regarding whether she, herself, initiated the placement for their protection or whether she simply abandoned them when she fled.

II. Evidence Contrary to Finding
Along with evidence supporting the trial court's finding of endangerment, we review the evidence contrary to its finding. Pool, 715 S.W.2d at 635. In caseworker Cook's words, when she saw D.T. on the date she was assigned to the case, he "was clean, he looked very healthy. He was real healthy, happy, smiling." There was no indication that D.T. had been abused or neglected. Indeed, the documentation by Preston after D.T.'s emergency placement reflects not only that D.T. was "on target developmentally for his age" and appeared to be "a healthy child" but also that Appellant was able to meet D.T.'s "basic material needs prior to incarceration."
Cook's testimony that an emergency removal was only necessary because Appellant could not make bond is particularly significant. Preston agreed with this opinion by testifying that TDPRS would not have taken the child except for the fact that Appellant was incarcerated. It was undisputed that Appellant would be eligible for release within nine months of the time of the hearing in January 1999. The only testimony regarding the State of Montana charges was Appellant's testimony that she was told she would be credited for the time served in Texas and it was her understanding she would not have to do additional time.
Absent specific guidance from the supreme court on the troublesome issue of termination of an imprisoned parent's rights, we believe that, in considering all of the evidence, we should look not only at incarceration as a "factor" but also at the expected length of the sentence and whether the underlying conduct is of a type, in and of itself, from which endangerment of the child may be inferred. In this regard, the current statutory scheme for involuntary termination of parental rights in Texas is instructive. As amended in 1997, the family code now includes imprisonment for two years or more as a separate ground for termination (along with a finding of best interest). Tex.Fam.Code Ann. § 161.001(1)(Q) (providing for termination based on knowing commission of criminal offense resulting in confinement for two years or more from date petition for termination is filed). TDPRS did not plead that section as a basis for termination in this case, nor would it have been applicable, based on the evidence of Appellant's release date.
Because the Legislature specified a minimum period of imprisonment of two years from the date of filing the petition, it is reasonable to assume that the Legislature intended that imprisonment for less than that length of time would be insufficient, standing alone, to support involuntary termination. Because the State does not dispute that Appellant's length of confinement in Texas was for less than that amount of time, and it is speculative as to what confinement, if any, she might ever serve under pending charges from other states, we believe it is consistent with the statutory scheme to hold that TDPRS was required to show either a course of underlying conduct leading to her imprisonment, or in addition to the imprisonment, a course of conduct that was, itself, of an endangering nature to the child.
That our decision is consistent with the Texas statutory scheme regarding the effect of criminal conduct and imprisonment is further supported by the detailed list of crimes under section 161.001(1)(L), which are deemed to constitute a sufficient basis for termination, each of which is of an endangering nature and each of which must also be found to have caused the "death or serious injury" of a child. Tex. Fam.Code Ann. § 161.001(1)(L). Writing bad checks is not included in the list.
*639 The manner in which the issue has been handled by statute and by courts in other states is also instructive. E.g., Ariz.Rev. Stat.Ann § 8-533 (West 1989 & Supp. 1997) (permitting termination for conviction of felony of such nature to prove "unfitness"); Ind.Code Ann. § 31-35-5-4 (West Supp.1997) (allowing termination if conviction is for certain type of crime, including murder and rape); In re L.A.S., 134 N.J. 127, 631 A.2d 928, 935-36 (1993) (holding nature of underlying crime and length of sentence are relevant factors, among others, in termination case involving incarcerated parent); In re Christina P., 175 Cal.App.3d 115, 220 Cal.Rptr. 525, 535 (1985) (holding certain crimes may sufficiently show "depravity" of parent to warrant termination); see generally Parent's Involuntary Confinement, Or Failure To Care For Child As Result Thereof, As Evincing Neglect, Unfitness, Or The Like In Dependency Or Divestiture Proceeding, 79 A.L.R.3d 417, 417 (1977) (focusing on the consequential inability to care for one's children due to confinement).
It is undisputed that this is Appellant's first jail sentence, and it is for a relatively short time, running concurrently with the time she would receive for the Montana charges. The evidence amounts only to "possibilities" as to Appellant's future incarceration on other unspecified charges in other states. The underlying criminal conduct of writing hot checks, in and of itself, is not a type of conduct from which physical or emotional endangerment of a child may be inferred, nor is there any evidence of unrelated conduct of Appellant specifically toward D.T. that might be so characterized.
To the contrary, all the evidence indicates that D.T. was well-cared for by Appellant prior to her arrest, that he was bonding with Appellant, that he slept with her at night and was with her most of the time except when she was at work, and that he was generally a healthy, happy baby. It is also undisputed that Appellant has fulfilled each of the tasks assigned to her by the family service plan to the best of her ability and that her inability to visit with D.T. is solely due to the TDPRS policy.
The concurring justice asserts that this type of evidence is relevant only on the issue of best interest of the child. We have found no comparable case in which parental rights have been terminated in the context of an imprisoned parent. However, in other cases, judgments terminating parental rights based on endangerment have been reversed on similar evidence, without reaching the issue of best interest. In Clay v. Texas Department of Human Resources, the mother contacted the Department for help because she was being abused by her husband and the children were not safe in his presence. 748 S.W.2d 598, 599-600 (Tex.App.-Waco 1988, no writ). The children were placed in the temporary custody of TDHR at the mother's request. The mother paid all child support and attended almost all counseling sessions as ordered and visited with the children as allowed, but she had twenty-five different jobs and a number of different addresses during the three years after TDHR was granted temporary custody. In reversing the judgment terminating her parental rights, the reviewing court found there was no evidence the mother engaged in conduct that endangered the children. Id. at 600. The court noted that the mother posed no danger to her children and that she was "guilty of nothing more than suffering from some of life's misfortunes. She did not work at one place nor live at one place long enough to satisfy the TDHR." Id.
In Doria v. Texas Department of Human Resources, the evidence was that the mother left the children alone in a house with no running water, electricity, or heat and that a boyfriend abused her and possibly abused one child. 747 S.W.2d 953, 958-59 (Tex.App.-Corpus Christi 1988, no writ). The mother was unable to comply with the family service plan by attending *640 all counseling and parenting classes, obtaining adequate housing or visiting the children regularly. A TDHR worker was of the opinion that the children removed from the mother's home should not be returned because they no longer related to the mother and it was "not fair" to them. Id. at 957.
In reversing on the basis of factual insufficiency of the evidence of endangerment, the court of appeals noted that the house had been repaired, that the mother had attended a large number of the required classes and visits considering her low intelligence and poverty, that an abusive boyfriend was no longer allowed in the house, that the great weight of the evidence showed the mother was striving to conform to the service plan, and that she loved her children and was sincerely concerned about getting them back. Id. at 958-59; see also Ybarra v. Texas Dep't of Human Servs., 869 S.W.2d 574, 578 (Tex. App.-Corpus Christi 1993, no writ) (finding factual insufficiency of evidence to support termination based on mother's failure to comply with DHS directions and goals).
Although the parents were not incarcerated in those cases, we believe that the relationship of the parent and child, as well as efforts to improve or enhance parenting skills, are relevant in determining whether a parent's conduct results in "endangerment" of the child under section 161.001(1)(E), even where the parent is incarcerated. Tex.Fam.Code Ann. § 161.001(1)(E); see also Steven Fleischer, 29 SETON HALL L.REV. at 314-15.
Like the mother in Clay, Appellant contacted TDPRS to ensure D.T.'s safety. Like the mothers in both Clay and Doria, she complied as fully as possible with the goals and objectives required by TDPRS in order to facilitate reunification with her son. TDPRS conceded Appellant complied in all possible respects with the service plan, wrote letters to Preston inquiring about D.T., and requested photographs and visits. Appellant acknowledged her criminal past was wrong. She has taken actions to correct her behavior, loves her son, and has taken advantage of classes and counseling sessions at the T.D.C. in compliance with the service plan to ensure that she lives a clean lifestyle. Despite repeated efforts by Appellant to contact Cook and Preston by telephone and in writing, TDPRS abandoned its reunification goal because Appellant was still incarcerated, placement with D.T.'s grandparents was not possible, and only eight months remained for the court to render a final order of termination or to dismiss the suit.[12] Tex.Fam.Code Ann. § 263.401(a).
Regarding the evidence that Appellant left her other two children in Montana when she jumped bond, Appellant testified that she could not support her two other children financially and that she left Montana in part to escape D.T.'s abusive father. After Appellant left D.T.'s abusive father, D.T. was born, and she got a job in Texas and found a babysitter for him. When she was arrested in Texas, she made arrangements for the babysitter to continue caring for D.T. and then contacted TDPRS and asked it, herself, to assist in temporary placement.
On this record, we find that there is more than a scintilla of evidence of endangerment, but that the evidence is factually insufficient to establish by clear and convincing evidence that Appellant pursued a course of conduct that endangered the physical or emotional well-being of D.T.

BEST INTEREST OF THE CHILD
Appellant's brief also attacks the legal and factual sufficiency of evidence to support the trial court's finding that termination is in the best interest of D.T. Judicial inquiry as to the best interest of the child is deferred pending determination *641 that the petitioner has sufficiently established one or more of the acts or omissions enumerated in subdivision (1) of the statute. In re S.D.H., 591 S.W.2d at 638.
There is a strong presumption that the best interest of a child is served by keeping custody in the natural parent. In re K.C.M., 4 S.W.3d 392, 393-95 (Tex. App.-Houston [1st Dist.] 1999, pet. denied); Ziegler v. Tarrant County Child Welfare Unit, 680 S.W.2d 674, 676 (Tex. App.-Fort Worth 1984, writ ref'd n.r.e.). The fact-finder must consider a number of factors in determining the best interest of the child, including the desires of the child, the present and future physical and emotional needs of the child, the present and future emotional and physical danger to the child, the parental abilities of the person seeking custody, programs available to assist those persons in promoting the best interest of the child, plans for the child by those individuals or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. Holley, 544 S.W.2d at 371-72.
D.T. is only eighteen months old and obviously unable to communicate his wishes. As to his emotional and physical needs, the evidence affirmatively established that those needs were adequately met by Appellant in the past, as shown by the evidence that D.T. was developmentally and intellectually on-target, has no special needs, and was happy and healthy when placed in custody of the TDPRS. Caseworker Preston acknowledged D.T.'s past home environment could be considered safe. There is no evidence whatsoever as to any actual emotional or physical danger to D.T. in the past. It is undisputed that D.T. is not currently endangered and his emotional and physical needs are being met in foster care. No evidence, direct or indirect, was offered by TDPRS regarding D.T.'s future emotional or physical needs or endangerment to him in the future. Caseworker Preston testified that, in her opinion, it is in the best interest of D.T. for the parent-child relationship with Appellant to be terminated because of Appellant's current separation from him while she is incarcerated and because "[s]he hasn't shown she can provide a safe, stable home for him." Aside from the fact that her statement would improperly reverse the burden of proof, Preston was not looking toward the future when Appellant would be released. She admitted, "We're not even looking to August. We're dealing with right now."
There was no evidence that Appellant currently lacked parenting ability. It was undisputed that Appellant had taken advantage of and had completed the psychological testing and counseling offered to her. There was no evidence of availability of child care assistance or counseling in the future to assist her with D.T., nor was any evidence offered as to financial entitlement programs available. As to plans for the future, Appellant testified that her mother has asked her to come back to Alabama after her release date. Appellant wants to finish school, and her mother said she will help her. TDPRS's plans for D.T. were not stated. Although Preston testified that the current foster parents would be willing to adopt, there was no testimony from the foster parents.
There was no evidence of abuse, neglect, or any other indication of an inappropriate parent-child relationship between Appellant and D.T. As to "excuse," Appellant candidly offered none, but testified she realized her conduct was wrong and has taken advantage of everything offered by the Texas Department of Corrections to make sure she does not go back.
The evidence of Appellant's past course of conduct of writing bad checks apparently spans several years. This evidence, when considered with her conduct of jumping bond and leaving her other children in Montana, meets only one of the factors enumerated in Holley: evidence of her acts and omissions. While the evidence of *642 this factor overlaps the proof required to establish the statutory ground of endangerment by her conduct, this evidence is nevertheless some evidence, more than a scintilla, to support termination.
Viewing the evidence in the light most favorable to the judgment, there is legally sufficient evidence that the best interest of D.T. would be served by termination of Appellant's parental rights. However, based upon a review of the totality of the evidence as detailed above in light of the Holley factors, including evidence contrary to the trial court's findings, we hold that the evidence is so weak as to be factually insufficient to establish by clear and convincing evidence that the best interest of D.T. will be served by terminating Appellant's parental rights.

CONCLUSION
Having determined the evidence is legally insufficient to support the findings under section 161.001(1)(D) and (N), we sustain Appellant's first point as to those findings. When we sustain a "no-evidence" point, it is our duty to render judgment for the appellant because that is the judgment the trial court should have rendered. Tex.R.App.P. 43.3; Vista Chevrolet, Inc. v. Lewis, 709 S.W.2d 176, 176 (Tex.1986) (quoting National Life & Accident Ins. Co. v. Blagg, 438 S.W.2d 905, 909 (Tex.1969)). Therefore, we reverse the trial court's judgment under section 161.001(1)(D) and (N) and render judgment for Appellant on these grounds.
Having determined the evidence is factually insufficient to support the findings under section 161.001(1)(E) and (2), we are of the opinion that the judgment terminating Appellant's parental rights is manifestly unjust. We sustain Appellant's points as to the applicable findings. We reverse the trial court's judgment on the grounds of section 161.001(1)(E) and (2) and remand that portion of the cause for a new trial. B.J. Valve & Fitting Co. v. Elliott Valve Repair Co., 679 S.W.2d 1, 1 (Tex. 1984).
JOHN HILL, J. (Retired), filed a concurring opinion.
JOHN HILL, Justice, concurring (Retired).
I concur in the result only because, while I agree with the majority that the evidence is factually insufficient to support the trial court's finding that termination of Appellant's parental rights is in the best interest of the child, I disagree with the majority's conclusion that the evidence is factually insufficient to support the trial court's finding that Appellant engaged in conduct that endangered the physical and emotional well-being of the child.
The majority agrees that the evidence is legally sufficient to support the finding that Appellant engaged in conduct that endangered the physical and emotional well-being of D.T., but finds that the evidence is factually insufficient to support the finding. As I understand the evidence, Appellant, prior to the birth of D.T., fled the State of Montana in order to avoid prosecution for bad checks and to escape an abusive husband. In doing so, she left behind two children who ultimately ended up in the care of her mother. When asked by a child investigator for the Texas Department of Protective and Regulatory Services (TDPRS) why she had not contacted the children, she testified that it was because they were better off in foster care. She testified that there is an outstanding warrant out for her arrest in Montana as a result of bail revocation. She also acknowledged that there is a pending charge in that state for bad checks.
Appellant was arrested in February 1998, shortly after D.T.'s birth in August 1997. In January 1999, at the time of the trial of this termination proceeding, Appellant was in state jail following her conviction for a state jail felony in Texas. She was expecting to be released in August 1999. She acknowledged having been convicted *643 of a felony involving bad checks in Utah. She said that some of her out-of-state cases might be four or five years old. Appellant testified that she had been told that there might be arrest warrants out for her in five different states. She indicated that those arrest warrants were based upon her conduct, that she knew there would be a possibility of her going to jail, that if she went to jail she would not be able to parent her child, and that she engaged in a continuing course of conduct of writing bad checks or engaging in an activity that might get her arrested.
In holding the evidence is factually insufficient to support the trial court's finding that Appellant engaged in conduct endangering the physical and emotional well-being of D.T., the majority relies upon testimony indicating that D.T. was in good health and had not been abused, that Appellant was taking good care of D.T. before her arrest and was doing the best she could while incarcerated to indicate her interest in D.T., that the only reason for emergency removal of D.T. when Appellant was initially arrested was because she could not make bail, that the Appellant contacted the TDPRS after she was arrested to ensure D.T.'s safety, that she complied as fully as possible with the goals and objectives required of her by the Department, and that her conviction was not for a crime from which, in and of itself, physical or emotional harm to the child might be inferred.
The majority relies in part upon a law review article from the SETON HALL LAW REVIEW, authored by Steven Fleischer. In that article, Fleischer states that, while the psychological effects of parental incarceration on children vary greatly from child to child, parental incarceration can have a pronounced negative effect on a child and may temporarily or permanently affect the child's development and future relationships. Steven Fleischer, Termination of Parental Rights: An Additional Sentence for Incarcerated Parents, 29 Seton Hall L.Rev. 312, 321 (1998). It is undisputed that Appellant engaged in a pattern of criminal conduct over a lengthy period of time that ultimately resulted in imprisonment for over a year and a half. It appears that there is a reasonable possibility of more incarceration to come. Therefore, it is my opinion that the evidence is undisputed that Appellant engaged in conduct that endangered the physical and emotional well-being of her child.
The remaining issue is whether termination of the parent-child relationship is in D.T.'s best interest. I believe all the evidence the majority relies upon in holding that the evidence is factually insufficient to support the trial court's finding on the endangerment issue is relevant to the best interest issue. However, the evidence does not contradict the undisputed testimony that shows Appellant engaged in conduct that endangered the physical and emotional well-being of D.T. Evidence that D.T. did not actually suffer injury is not inconsistent with the finding. Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987). Evidence that Appellant is a loving mother who cares about her child is not inconsistent with the finding because loving mothers can, and Appellant did, engage in conduct that endangers the child. The potential harm to D.T. comes from her course of conduct and the resulting imprisonment. While the nature of a course of conduct, in and of itself, may sometimes support termination, the fact that the conduct, in and of itself, does not pose such a danger does not keep the conduct from posing a danger when coupled with the imprisonment that results from such conduct. Because the evidence relied upon by the majority does not contradict the undisputed evidence the majority found to be legally sufficient to support the trial court's finding on the endangerment issue, I believe the majority is in error in holding the evidence factually insufficient to support the finding on endangerment.
NOTES
[1] Appellant is sometimes referred to in the record by her married name, L.J.P.
[2] D.B., the biological father of D.T., is sometimes referred to in the reporter's record as D.V. In the clerk's record, he is identified as D.B.
[3] A home study was later performed on the paternal grandparents, and as a result, placement with them was denied.
[4] E.g., In re J.N.R., 982 S.W.2d 137, 142-43 (Tex.App.-Houston [1st Dist.] 1998, no pet.); In re B.S.T., 977 S.W.2d 481, 484, n. 4 (Tex. App.-Houston [14th Dist.] 1998, no pet.); In re JJ. & K.J., 911 S.W.2d 437, 439-40 (Tex. App.-Texarkana 1995, writ denied); Spurlock v. Texas Dep't of Protective & Regulatory Servs., 904 S.W.2d 152, 155-56 (Tex.App.-Austin 1995, writ denied); In re A.D.E., 880 S.W.2d 241, 245 (Tex.App.-Corpus Christi 1994, no writ); D.O. v. TDHS, 851 S.W.2d 351, 353 (Tex.App.-Austin 1993, no writ).
[5] E.g., In re B.R., 950 S.W.2d 113, 117-18 (Tex.App.-El Paso 1997, no pet.); Spangler v. Texas Dep't of Protective & Regulatory Servs., 962 S.W.2d 253, 257 (Tex.App.-Waco 1998, no pet.); In re H.C., 942 S.W.2d 661, 663-64 (Tex.App.-San Antonio, 1997, no pet.); In re L.S., 748 S.W.2d 571, 572-73 (Tex.App.-Amarillo 1988, no writ); Neiswander v. Bailey, 645 S.W.2d 835, 835-36 (Tex.App.-Dallas 1982, no writ); see generally Bill Vance, The Clear and Convincing Evidence Standard in Texas: A Critique, 48 Baylor L.Rev. 391 (1996) (discussing why an additional standard of review should be developed for appellate review of findings of fact made under the clear and convincing evidence standard).
[6] Clear and convincing proof has not been required by the supreme court except where that heightened degree of proof has been mandated by constitutional or statutory requirements. Huckabee v. Time Warner Entm't Co., 19 S.W.3d 413, 423 (Tex.2000). Clear and convincing evidence is required both by due process and by statute in involuntary termination cases. In re G.M., 596 S.W.2d at 847; Tex.Fam.Code Ann. § 161.206(a).
[7] In effect, the trial court found that Appellant committed acts prohibited under section 161.001(1)(D), (E), and (N) and that termination was in D.T.'s best interest. Tex.Fam. Code Ann. § 161.001(1)(D), (E), (N), (2).
[8] Act of May 27, 1993, 73rd Leg., R.S., ch. 597, § 1, 1993 Tex.Gen.Laws 2254, 2254 (repealed 1995) (current version at Tex.Fam.Code Ann. § 161.001(1)(D)).
[9] The fact that D.T. was placed in foster care when Appellant was arrested is not, standing alone, evidence of endangerment. G.M. v. Texas Dep't of Human Res., 717 S.W.2d 185, 188 (Tex.App.-Austin 1986, no writ) (holding that leaving child in care of licensed foster parents did not "endanger" child's emotional or physical well-being).
[10] When Appellant was sixteen, she gave birth to a daughter and placed her for adoption. Later, Appellant married and had other children, one of whom, a twin with a heart defect, died at the age of three months from sudden infant death syndrome while Appellant was at work. Appellant was suspicious of his death because her former husband with whom she was then living had shaken the baby before and had blamed their pet cat for bruises she had once found on the baby. Although the State mentions this evidence, it does not rely on it as evidence of a conscious course of conduct that endangered D.T.
[11] The supreme court did not adopt the sentence in Wray that stated if the imprisonment "displays a voluntary, deliberate and conscious course of conduct, it qualifies as conduct which endangers the emotional well-being of the child." Wray, 640 S.W.2d at 71.
[12] If an extension of the trial court's jurisdiction under section 263.401(b) had been requested and granted, the final hearing could have been held nearer to the time of Appellant's scheduled release. Tex.Fam.Code Ann. § 263.401(b)(Vernon Supp.2000).