**Opinion filed February 24, 2014**



In The

# Eleventh Court of Appeals

_____

## No. 11-13-00255-CV

_____

## IN THE INTEREST OF F.H. A/K/A F.A., H.H., AND B.H., CHILDREN

**On Appeal from the 29th District Court**

**Palo Pinto County, Texas**

**Trial Court Cause No. C44915**

### M E M O R A N D U M   O P I N I O N

This is an appeal from an order of termination of the parental rights of the mother and father of F.H. a/k/a F.A., H.H., and B.H.  Both parents appeal.  We affirm.

In two issues on appeal, the children's parents challenge the factual sufficiency of the evidence to support termination.  The termination of parental rights must be supported by clear and convincing evidence.  TEX. FAM. CODE ANN. § 161.001 (West Supp. 2013).  To determine if the evidence is factually sufficient,

we give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). To terminate parental rights, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(1)(A)–(T) and that termination is in the best interest of the child. FAM. § 161.001.

With respect to the best interest of a child, no unique set of factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.J.O.*, 325 S.W.3d at 266.

In this case, the trial court found that the parents had committed four of the acts listed in Section 161.001(1): those found in subsections (D), (E), (O), and (P). Specifically, the trial court found that both parents had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being; that the parents had engaged in conduct or knowingly placed the children with persons who engaged in

2

conduct that endangered the children's physical or emotional well-being; that both parents had failed to comply with the provisions of a court order that specifically established the actions necessary for them to obtain the return of the children, who had been in the managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parents for abuse or neglect; and that both parents (a) used a controlled substance in a manner that endangered the children and (b) either failed to complete a substance abuse treatment program or continued to abuse a controlled substance after completing a substance abuse treatment program. The trial court also found, pursuant to Section 161.001(2), that termination of each parent's parental rights would be in the best interest of the children.

The evidence at the final hearing showed the children—ages two years, one year, and less than five months—were removed from the parents on August 23, 2012, when the Department received "another" intake. The parents had been participating in family-based safety services due to a previous incident. An investigator for the Department, Heather Dezomits, went to the family's residence and observed various things that concerned her. Dezomits testified that F.H. had a "large slap mark to her shoulder" that was "raised up" and "fresh." Only two people were in the residence that could have caused the mark: the mother and the father. F.H.'s hair was matted and knotted, and she was "scratching and scratching" due to head lice. H.H. had bruises on her face and a cigarette burn between her fingers. According to Dezomits, the parents stated that the children sometimes ran into the parents' cigarettes and admitted that they had smoked K2, an illegal substance, when the children were present.

Dezomits testified that the conditions of the residence on the day of the initial removal endangered the children. The children's bedroom contained many objects that were safety hazards for small children. The kitchen was not clean.

There were dirty dishes and old food on the dining table and dirty dishes "everywhere" in the kitchen. The children were eating off the floor. Each child's bedding was filthy. The bedding was brown or dark brown where the children's bodies had lain.

After the children were removed, the trial court ordered the parents to complete various tasks, including compliance with a family service plan. The Department returned the children to the parents on May 31, 2013, but removed the children again on June 12, 2013. The children's guardian ad litem made two visits to the parents' residence after the children were returned to the parents and before the parents moved from the residence from which they were evicted. The guardian ad litem informed the trial court that the children were disoriented and that the conditions of the residence were deplorable: it was "filthy" and it "stunk." The children were dirty and had been sleeping on "filthy" mattresses.

After being evicted on June 6, the parents and their children went to stay with relatives for a while. At the time of the second removal, they were at the home of the mother's mother in "filthy and very unsanitary" conditions. The home smelled of pet urine and feces, and dog feces was on the floor. The floor looked like it had not been cleaned in years. The kitchen and the dining area were covered with trash, food, and other things.

The Department also presented evidence that the parents had anger issues and that domestic violence occurred between the parents. The parents were involved in an altercation in a Fort Worth hospital where B.H. was hospitalized. According to the mother, the parents were under a lot of stress and "just had an argument that escalated" into a physical altercation. The father admitted at trial that he had "smacked her in the head." The Department's involvement with the family began with the hospital incident. After the initial removal, the parents were involved in another altercation in public. Harry Small Jr., a housing authority

4

director, testified that the parents were evicted for nonpayment of rent and for physical violence. On May 13, 2013, Small heard the parents arguing outside the office; they were "really loud." The argument continued as the parents walked down the street. Small watched them from the office. He said that they had stopped about fifty yards away when the mother "grabbed for" the father. The father jerked away and started to walk, but the mother "just started hitting him three or four times." The father then turned around and backhanded the mother. Small instructed the office manager to call the police.

With respect to drug use, the mother testified that, after H.H. was born with "pot" in her system, the mother completed a twelve-step program. The mother admitted at trial that she had used drugs after completing the twelve-step program; she admitted to Dezomits that she used K2 while on family-based safety services; and each parent tested positive "for amphetamines" more than once while this case was pending. The mother testified that she did not even know what amphetamines were and that she and the father no longer smoked synthetic marihuana. The father also tested positive for opiates; he explained that he had taken painkillers that were not prescribed to him.

The parents did not believe that termination of their parental rights would be in the children's best interest. However, the attorney ad litem for the children disagreed, as did the Department. The children's attorney ad litem informed the trial court that it was his position that it would not be in the children's best interest to be returned to the parents. The Department's conservatorship caseworker, Lorena Jennings, testified that termination of both parents' rights would be in the best interest of the children. Jennings testified that the parents had not taken the courses seriously and had not demonstrated an ability to control their anger, overcome domestic violence issues, or discontinue drug use. She testified that the children's foster parents were "motivated for adoption." The foster parents

provided the children with needed structure. The children were well cared for, happy, healthy, safe, and doing very well in their placement with the foster parents. The foster parents and the children had bonded, and the children had grown to love the foster parents. Jennings testified that the parents, unfortunately, were not able to provide the children with a structured, safe home free of domestic violence and drug use.

We hold that there was clear and convincing evidence from which the trial court could reasonably have formed a firm belief that both parents (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being or (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. FAM. § 161.001(1)(D), (E).

Under subsection (D), we examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 630 (Tex. App.—Fort Worth 2000, pet. denied). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the children's well-being was the direct result of the parents' conduct, including acts, omissions, or failures to act. *In re D.O.*, 338 S.W.3d 29, 33 (Tex. App.—Eastland 2011, no pet.). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re D.T.*, 34 S.W.3d at 634; *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.). The offending conduct does not need to be directed at the child, nor does the child actually have to suffer an injury. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Domestic violence may constitute evidence of endangerment. *Id.*; *C.J.O.*, 325 S.W.3d at 265.

In this case, there was evidence that the conditions of the parents' residence upon initial removal and the conditions of the residence where the children were living at the time of re-removal endangered the children. The mother agreed that the conditions of her mother's house, where the family was staying at the time of re-removal, were unsuitable. The father testified that her house was "a bad environment for anybody." With respect to subsection (E), the evidence showed that the parents used drugs and committed domestic violence. Such acts constituted conduct that endangered the children. The evidence is factually sufficient to support the trial court's finding as to each parent under Section 161.001(1)(D) and Section 161.001(1)(E). Because a finding that a parent committed one of the acts listed in Section 161.001(1)(A)–(T) is all that is required under that statute, we need not address the parents' remaining arguments regarding the sufficiency of the evidence to support the trial court's other findings under Section 161.001(1). *See* TEX. R. APP. P. 47.1. The parents' first issue is overruled.

We also hold that, based on the evidence presented at trial and the *Holley* factors, the trial court could reasonably have formed a firm belief or conviction that termination of both the father's and the mother's parental rights would be in the best interest of the children. *See Holley*, 544 S.W.2d at 371–72. We cannot hold that the findings as to best interest are not supported by clear and convincing evidence.

Upon considering the record as it relates to the desires of the children, the emotional and physical needs of the children now and in the future, the emotional and physical danger to the children now and in the future, the parental abilities of the parents and the foster parents, the plans for the children by the Department, the instability of the parents' home, the stability of the children's placement, acts and omissions indicating that the parent-child relationship was not a proper one, the domestic violence between the parents, violence against the children, and the

7

parents' continued drug use, we hold that the evidence is sufficient to support the findings that termination of the father's and the mother's parental rights is in the best interest of the children. *See id.* The parents' second issue is overruled.

We affirm the trial court's order of termination.


JIM R. WRIGHT

CHIEF JUSTICE


February 24, 2014

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.