COURT OF APPEALS
SECOND 
DISTRICT OF TEXAS
FORT WORTH
 
NO. 
2-04-076-CV
 
 
 
IN 
THE INTEREST OF
G.G. 
AND J.G., CHILDREN
 
 
 
------------
 
FROM 
THE 323RD DISTRICT COURT OF TARRANT COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
I. Introduction
        Appellant 
Norma G. appeals the trial court’s order terminating her parental rights to 
her children, G.G. and J.G. In two points, appellant argues that (1) the 
evidence is factually insufficient to support the trial court’s judgment 
terminating her parental rights and (2) the trial court erred by failing to 
dismiss the State’s suit affecting the parent child relationship. We affirm.
II. Background Facts
        Appellant 
is the mother of G.G., who is twelve years old, and J.G., who is five years old. 
On August 23, 2002, after an incident in which J.G. was severely burned, the 
Texas Department of Protective and Regulatory Services (TDPRS) filed a petition 
to terminate appellant’s parental rights to G.G. and J.G., and the trial court 
named TDPRS temporary managing conservator of the children.
        Kay 
Tucker became J.G.’s foster mother when he was released from the hospital on 
August 29, 2002. She became G.G.’s foster mother several months later. The 
case went to trial on February 24, 2004. Appellant waived her right to a jury, 
and all questions of law and fact were submitted to the trial court. The trial 
court signed an order terminating appellant’s parental rights to G.G. and J.G. 
on March 1, 2004.[2]
III. Factual Sufficiency
        In 
her first point, appellant argues that the evidence is factually insufficient to 
support the trial court’s judgment terminating her parental rights to G.G. and 
J.G. Specifically, appellant challenges the trial court’s findings that (1) 
appellant knowingly placed or knowingly allowed her children to remain in 
conditions or surroundings which endanger the physical or emotional well-being 
of the children, (2) appellant engaged in conduct or knowingly placed the 
children with persons who engaged in conduct which endangers the physical or 
emotional well-being of the children, and (3) termination of the parent-child 
relationship between appellant and her children is in the children’s best 
interest.[3]
        A 
parent’s rights to “the companionship, care, custody, and management” of 
his or her children are constitutional interests “far more precious than any 
property right.” Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S. Ct. 
1388, 1397 (1982). “While parental rights are of constitutional magnitude, 
they are not absolute. Just as it is imperative for courts to recognize the 
constitutional underpinnings of the parent-child relationship, it is also 
essential that emotional and physical interests of the child not be sacrificed 
merely to preserve that right.” In re C.H., 89 S.W.3d 17, 26 (Tex. 
2002). In a termination case, the State seeks not just to limit parental rights 
but to end them permanently—to divest the parent and child of all legal 
rights, privileges, duties, and powers normally existing between them, except 
for the child’s right to inherit. Tex. 
Fam. Code Ann. § 161.206(b) (Vernon Supp. 2004-05); Holick v. Smith, 
685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings 
and strictly construe involuntary termination statutes in favor of the parent. Holick, 
685 S.W.2d at 20-21; In re D.T., 34 S.W.3d 625, 630 (Tex. App.—Fort 
Worth 2000, pet. denied) (op. on reh’g).
        In 
proceedings to terminate the parent-child relationship brought under section 
161.001 of the family code, the petitioner must establish one or more of the 
acts or omissions enumerated under subdivision (1) of the statute and must also 
prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon 
2002); Richardson v. Green, 677 S.W.2d 497, 499 (Tex. 1984); Swate v. 
Swate, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied). Both 
elements must be established; termination may not be based solely on the best 
interest of the child as determined by the trier of fact. Tex. Dep’t of 
Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).
        Termination 
of parental rights is a drastic remedy and is of such weight and gravity that 
due process requires the petitioner to justify termination by clear and 
convincing evidence. Tex. Fam. Code Ann. 
§§ 161.001, 161.206(a); In re G.M., 596 S.W.2d 846, 847 (Tex. 1980). 
This intermediate standard falls between the preponderance standard of ordinary 
civil proceedings and the reasonable doubt standard of criminal proceedings. G.M., 
596 S.W.2d at 847; D.T., 34 S.W.3d at 630. It is defined as the 
“measure or degree of proof that will produce in the mind of the trier of fact 
a firm belief or conviction as to the truth of the allegations sought to be 
established.” Tex. Fam. Code Ann. 
§ 101.007 (Vernon 2002).
        The 
higher burden of proof in termination cases alters the appellate standard of 
factual sufficiency review. C.H., 89 S.W.3d at 25. “[A] finding that 
must be based on clear and convincing evidence cannot be viewed on appeal the 
same as one that may be sustained on a mere preponderance.” Id. In 
considering whether the evidence of termination rises to the level of being 
clear and convincing, we must determine “whether the evidence is such that a 
factfinder could reasonably form a firm belief or conviction” that the grounds 
for termination were proven. Id. Our inquiry here is whether, on the 
entire record, a factfinder could reasonably form a firm conviction or belief 
that the parent violated one of the conduct provisions of section 161.001(1) and 
that the termination of the parent’s parental rights would be in the best 
interest of the child. Id. at 28.
A. Conduct
        In 
the present case, appellant testified that around 2:00 p.m. on August 19, 2002, 
she gave J.G. a bath after cleaning the tub with Clorox bleach. She testified 
that after his bath, J.G. asked her for some milk and then went to sleep. 
Appellant went to work around 6:00 that evening and left J.G. and G.G. in the 
care of her boyfriend Alejandro Zapata. At around 6:30, Zapata brought both 
children to appellant’s work because J.G.’s legs were red. Appellant 
testified that because J.G. was wearing long pants, she could see only his feet. 
She testified that J.G.’s feet were red, not blistered, and that she thought 
he was having an allergic reaction. Appellant told Zapata to take J.G. home and 
that they would get something for him when she got off work.
        Appellant 
testified that when she got home around 10:00 that evening, J.G. did not seem to 
be in any pain. She applied Vaseline to his burns, changed his diaper, and put 
him to bed. The next day, appellant went to work and again left the children in 
Zapata’s care. The same day, she noticed that J.G. was scratching his burns, 
causing his skin to come off.[4]
        The 
next day, on August 21, Zapata went to work while appellant stayed home. 
Appellant called Zapata at work and told him that J.G. was getting worse and 
that she was going to take him to the doctor. Zapata left work, and they took 
J.G. to Cook Children’s Medical Center. Appellant testified that she had not 
taken J.G. to the hospital earlier because she was afraid he was going to be 
taken away from her.
        Child 
Protective Services (CPS) investigator Julie Nash testified that J.G.’s older 
brother, G.G., gave a different account of what happened to J.G. She testified 
that G.G. told her that after appellant had gone to work on August 19, Zapata 
gave J.G. a bath. G.G. heard water running, some splashing, and J.G. saying 
“agua, agua.” After J.G.’s bath, G.G. noticed that J.G.’s legs were red. 
Kay Tucker, the children’s foster mother, testified that during play therapy, 
the therapist told J.G. to pretend that he was Zapata and that a doll was 
himself. Tucker testified that J.G. pretended to force the doll into a tub of 
hot water while making crying noises.
        Melissa 
Jane Garrettson, an emergency room physician who works at Cook Children’s 
Medical Center, testified that on August 21, 2002, J.G. was brought to the 
center with second-degree burns over twenty-five percent of his body. J.G. was 
in severe distress with an elevated heart rate, respiratory rate, and blood 
pressure. According to Dr. Garrettson, J.G. was grunting and appeared to be in 
significant pain. After determining that J.G.’s injuries were 
life-threatening, Dr. Garrettson arranged for him to be transferred to the burn 
unit at Parkland Hospital.
        Dr. 
Garrettson testified that appellant, who does not speak English, told a 
translator that she had bathed J.G. in a tub that she had recently cleaned with 
Clorox bleach. However, Dr. Garrettson testified that appellant’s explanation 
was not consistent with J.G.’s injuries. She testified that there were 
specific lines of demarcation between J.G.’s burned skin and normal skin, 
which indicated that J.G. had been burned by being placed in hot water rather 
than water containing residual Clorox bleach. Dr. Garrettson also testified that 
J.G.’s buttocks were not as severely burned as his legs, which was further 
evidence of an immersion burn because a ceramic or plastic tub is not as hot as 
the surrounding water. Dr. Garrettson testified that electrolyte and blood gas 
tests performed on J.G. did not indicate an acid chemical burn. Finally, Dr. 
Garrettson testified that the pattern of his burns indicated that he had been 
trying to keep part of his body out of the water and that his injuries were the 
result of child abuse.
        Joshua 
Ernest Roller is a physician with Parkland Hospital in Dallas. He testified that 
after arriving at Parkland, J.G.’s burns were cleaned with a bristle brush in 
order to remove as much of the dead skin and bacteria as possible. Dr. Roller 
testified that this process, known as “debriding,” is very painful for 
patients such as J.G. who have second-degree burns because their nerve endings 
are exposed. J.G. ‘s burns were debrided every day until he had his first skin 
graft surgery. Ultimately, J.G. underwent two surgeries to repair the damage 
caused by his burns.
        Dr. 
Roller testified that because appellant waited two days before seeking medical 
treatment for J.G., she increased his risk for multisystem organ failure and 
sepsis, both of which could have caused his death. Further, Dr. Roller testified 
that the severity of J.G.’s burns would have been obvious on the evening of 
August 19, 2002. He testified that J.G. would have been in a significant amount 
of pain and that Vaseline would not have helped to ease his pain. Dr. Roller 
pointed to the same evidence cited by Dr. Garrettson in concluding that J.G.’s 
burns were caused by his having been forcibly immersed in hot water.
        Dr. 
Roller testified that Xrays of J.G. showed fractures to his arm and collarbone 
that had healed. Nash testified that appellant said that J.G. had broken his arm 
while he was in the care of a babysitter in Mexico. Appellant told Nash that she 
initially did not know that J.G. was hurt but that she questioned the babysitter 
after J.G. began complaining of pain. The babysitter told appellant that J.G. 
had fallen off the top of a car onto the cement. Appellant testified that she 
took J.G. to see a doctor. But because some time had elapsed since the injury, 
the fracture had already begun to heal and could not be treated. Appellant could 
not explain how J.G. had broken his collarbone.
        The 
evidence indicates that on several occasions, appellant failed to seek prompt 
medical treatment for J.G. On one of these occasions, appellant’s delay in 
seeking medical treatment for J.G. could have resulted in his death. There is 
evidence that appellant understood or should have understood the severity of 
J.G.’s burns and yet chose not to take him to see a doctor because she was 
afraid he would be taken away from her. Based on our review of the entire 
record, we conclude that the trial court could reasonably form a belief or 
conviction that appellant engaged in conduct that endangered her children’s 
physical or emotional well-being, and therefore, we hold that the evidence is 
factually sufficient to support the trial court’s finding. See Tex. Fam. Code Ann. § 161.001(1)(E).
        Because 
a petitioner need establish only one of the acts or omissions enumerated under 
subdivision (1) of section 161.001, we need not address whether the evidence is 
factually sufficient to support the trial court’s finding that appellant 
knowingly placed or knowingly allowed her children to remain in conditions or 
surroundings which endangered the physical or emotional well-being of her 
children. See id. § 161.001(1)(D). Instead, we will next address the 
trial court’s finding that termination of appellant’s parental rights was in 
the children’s best interest. See id. § 161.001(2).
B. Best Interest
        Nonexclusive 
factors that the trier of fact in a termination case may use in determining the 
best interest of the child include
    
        (1)    
the desires of the child,
 
        (2)    the 
emotional and physical needs of the child now and in the future,
 
        (3)    the 
emotional and physical danger to the child now and in the future,
 
        (4)    the 
parental abilities of the individuals seeking custody,
 
        (5)    the 
programs available to assist these individuals to promote the best interest of 
the child,
 
        (6)    the 
plans for the child by these individuals or by the agency seeking custody,
 
        (7)    the 
stability of the home or proposed placement
 
        (8)    the 
acts or omissions of the parent which may indicate that the existing 
parent-child relationship is not a proper one, and
 
        (9)    any 
excuse for the acts or omissions of the parent.
 
 
Holley 
v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors are not 
exhaustive; some listed factors may be inapplicable to some cases; other factors 
not on the list may also be considered when appropriate. C.H., 89 S.W.3d 
at 27. Furthermore, undisputed evidence of just one factor may be sufficient in 
a particular case to support a finding that termination is in the best interest 
of the children. Id. On the other hand, the presence of scant evidence 
relevant to each Holley factor will not support such a finding. Id.
        1. Desires of G.G. and J.G.
        Tucker 
testified that G.G. has told her several times that he would like to go home to 
live with appellant. Tucker also testified, however, that G.G. told her that he 
was happy staying with her. Tucker testified that J.G. has not told her where he 
would like to live. She testified that he is happy when appellant visits and is 
happy when he is with the Tuckers.

2. The Emotional and Physical Needs of the Children 
Now and in the Future
 
        Burns 
testified that J.G. has shown symptoms of attachment disorder but that his 
condition is improving with therapy. Tucker testified that when J.G. first 
arrived at her house, he was scared to take a bath. She testified that even now 
J.G. wants to touch the water as it comes out of the faucet and will not get 
into a tub if it already contains water. She also testified that J.G. shows 
signs of being a perfectionist. He will not wear socks if they are wrinkled and 
insists that his shoe laces be tied tightly. She testified that J.G. always 
wants to be very clean and does not like change in his daily routine.
        Burns 
testified that G.G. has trouble with peer relationships, anger management, and 
the ability to express his feelings. Burns testified that G.G. wants to have 
some amount of control over what is happening in his life and where he will be 
living. He also testified that G.G.’s primary concern is stability and knowing 
what lies in store for him. He testified that although G.G. assumes the role of 
caretaker for his younger brother, G.G. is becoming more independent. Tucker 
testified that G.G. and J.G. are very close to one another, and Burns testified 
that everything should be done to keep the two together.
3. The Emotional and Physical Danger to the Children 
Now and in the Future
 
        As 
part of appellant’s service plan, TDPRS wanted appellant to accept that 
J.G.’s burns were not caused by residual Clorox bleach but were caused by 
Zapata’s forcibly immersing J.G. in hot water. Shantal Sparks, a TDPRS 
caseworker, testified that TDPRS was concerned that appellant would not be able 
to protect her children from future abuse if she did not think that abuse had 
occurred in the past. Sparks also testified that she told appellant that Zapata 
was the primary suspect in an investigation that was being conducted by CPS and 
the police department into J.G.’s injuries. Sparks told appellant that TDPRS 
was concerned about returning the children to her care as long as she continued 
to live with Zapata and offered to help appellant with applying for housing 
assistance. Appellant refused to believe that Zapata had caused J.G.’s 
injuries, however, and she did not leave Zapata until eight months after J.G. 
and G.G. were taken away from her.
4. The Plans for the Child by these Individuals or by 
the Agency Seeking Custody
 
        Although 
Kay Tucker testified that she and her husband are not currently looking to adopt 
G.G. and J.G., she also testified that they are very attached to the children 
and would be happy to keep them until they are eighteen years old. She testified 
that the children are very adoptable and that several people at her church have 
expressed interest in adopting them. Appellant testified that she missed several 
of her visits with G.G. and J.G. because she did not have money for gas or for 
gifts for G.G. and J.G. But she testified that if the children were given back 
to her, she would “do everything that’s possible to get them to the 
doctor” if they needed medical attention in the future. Appellant also 
testified that her brother may be able to get her a job in Phoenix.
5. The Stability of the Home or Proposed Placement
        Appellant 
testified that she has not had a permanent job since April 2003. She testified 
that she sometimes cleans houses and gets $50 per job. Appellant testified that 
she is staying with her cousin but will sometimes sleep at another cousin’s 
house. Sparks testified that she has not been able to verify where appellant 
lives since October or November 2003. She testified that appellant gave TDPRS 
the address for a cousin with whom she was supposed to be living. But when 
Sparks called the cousin, the cousin told her that appellant did not live with 
her.
        Based 
on our review of the entire record, we hold that the evidence was factually 
sufficient to support the trial court’s finding that termination was in the 
children’s best interest. We overrule appellant’s first point.
IV. Motion to Dismiss
        In 
her second point, appellant argues that the trial court erred by not dismissing 
TDPRS’s suit affecting the parent-child relationship after the statutory 
deadline for entering a final order passed. Section 263.401 of the Texas Family 
Code requires a trial court to dismiss a suit affecting the parent-child 
relationship if it fails to render a final order or grant an extension on the 
first Monday following the anniversary date that the court appointed TDPRS as 
temporary managing conservator. Tex. Fam. 
Code Ann. § 263.401(a) (Vernon 2002); In re M.N.G., 147 S.W.3d 
521, 527-28 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh’g). The 
trial court may extend this deadline for up to 180 days if it finds that 
continuing the appointment of the department as temporary managing conservator 
is in the best interest of the child. Id. § 263.401(b). According to 
section 263.402(b), however, a party who “fails to make a timely motion to 
dismiss the suit or to make a motion requesting the court to render a final 
order before the deadline for dismissal . . . waives the right to object to the 
court’s failure to dismiss the suit.” Id. § 263.402(b).
        In 
the present case, the trial court appointed TDPRS temporary managing conservator 
of G.G. and J.G. on August 23, 2002. Thus, the trial court was required to 
render a final order on or before August 25, 2003, the first Monday following 
the anniversary of the appointment. See id. § 263.401(a). On June 9, 
2003, the trial court granted an extension under 263.401(b), setting the new 
deadline for entering a final order as March 1, 2004. Appellant’s case went to 
trial on February 24, 2004, and the trial court signed a final order terminating 
appellant’s rights on March 1, 2004.
        Appellant 
argues that the trial court should have set the new deadline at February 22, 
2004 and erred by not dismissing the State’s suit on this date. But appellant 
never filed a motion to dismiss on these grounds. Therefore, appellant has 
waived her right to object to the trial court’s failure to dismiss the suit. See 
id. § 263.402(b); In re J.M.C., 109 S.W.3d 591, 595 (Tex. 
App.—Fort Worth 2003, no pet.). We overrule appellant’s second point.
V. Conclusion
        Having 
overruled both of appellant’s points, we affirm the trial court’s judgment.
  
  
                                                                  TERRIE 
LIVINGSTON
                                                                  JUSTICE
   
 
PANEL 
B:   LIVINGSTON, GARDNER, and WALKER, JJ.
 
DELIVERED: 
May 19, 2005

 
NOTES
1. 
See Tex. R. App. P. 47.4.
2. 
TDPRS also named the alleged biological fathers of G.G. and J.G. in its 
petition. TDPRS was unable to locate either father, however, and the trial court 
terminated their parental rights to G.G. and J.G. in the same order terminating 
appellant’s parental rights. Neither father is a party to the appeal.
3. 
Although the injury to J.G. was the basis of the suit, appellant does not 
challenge the trial court’s findings as they pertain to G.G. specifically.
4. 
Appellant did not say whether she noticed J.G. scratching his burns before or 
after she went to work.