IN THE INTEREST OF G.G.

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-076-CV

IN THE INTEREST OF 

G.G. AND J.G., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I. Introduction

Appellant Norma G. appeals the trial court’s order terminating her parental rights to her children, G.G. and J.G.  In two points, appellant argues that (1) the evidence is factually insufficient to support the trial court’s judgment terminating her parental rights and (2) the trial court erred by failing to dismiss the State’s suit affecting the parent child relationship.  We affirm.

II. Background Facts

Appellant is the mother of G.G., who is twelve years old, and J.G., who is five years old.  On August 23, 2002, after an incident in which J.G. was severely burned, the Texas Department of Protective and Regulatory Services (TDPRS) filed a petition to terminate appellant’s parental rights to G.G. and J.G., and the trial court named TDPRS temporary managing conservator of the children. 

Kay Tucker became J.G.’s foster mother when he was released from the hospital on August 29, 2002.  She became G.G.’s foster mother several months later.  The case went to trial on February 24, 2004.  Appellant waived her right to a jury, and all questions of law and fact were submitted to the trial court.  The trial court signed an order terminating appellant’s parental rights to G.G. and J.G. on March 1, 2004.
(footnote: 2) 

III. Factual Sufficiency

In her first point, appellant argues that the evidence is factually insufficient to support the trial court’s judgment terminating her parental rights to G.G. and J.G.  Specifically, appellant challenges the trial court’s findings that (1) appellant knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, (2) appellant engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, and (3) termination of the parent-child relationship between appellant and her children is in the children’s best interest.
(footnote: 3)  

A parent’s rights to “the companionship, care, custody, and management” of his or her children are constitutional interests “far more precious than any property right.”  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982).  “While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.”  
In re C.H.
, 89 S.W.3d 17, 26 (Tex. 2002).
  
In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit.  
Tex. Fam. Code Ann. 
§ 161.206(b) (Vernon Supp. 2004-05); 
Holick v. Smith
, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  
Holick
, 685 S.W.2d at 20-21;
 In re D.T.
, 34 S.W.3d 625, 630 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  
Tex. Fam. Code Ann. 
§ 161.001 (Vernon 2002); 
Richardson v. Green
, 677 S.W.2d 497, 499 (Tex. 1984); 
Swate v. Swate
, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  
Tex. Fam. Code Ann.
 §§ 161.001, 161.206(a); 
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980).  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.  
G.M.
, 596 S.W.2d at 847; 
D.T.
, 34 S.W.3d at 630.  It is defined as the “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”  
Tex. Fam. Code Ann. 
§ 101.007 (Vernon 2002).

The higher burden of proof in termination cases 
alters the appellate standard of factual sufficiency review.  
C.H.
, 89 S.W.3d at 25.  “[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.”  
Id
.  In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine “whether the evidence is such that a factfinder could reasonably form a firm belief or conviction” that the grounds for termination were proven.  
Id
.  Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated one of the conduct provisions of section 161.001(1) and that the termination of the parent’s parental rights would be in the best interest of the child.  
Id
. at 28. 

A. Conduct

In the present case, appellant testified that around 2:00 p.m. on August 19, 2002, she gave J.G. a bath after cleaning the tub with Clorox bleach.  She testified that after his bath, J.G. asked her for some milk and then went to sleep.  Appellant went to work around 6:00 that evening and left J.G. and G.G. in the care of her boyfriend Alejandro Zapata.  At around 6:30, Zapata brought both children to appellant’s work because J.G.’s legs were red.  Appellant testified that because J.G. was wearing long pants, she could see only his feet.  She testified that J.G.’s feet were red, not blistered, and that she thought he was having an allergic reaction.  Appellant told Zapata to take J.G. home and that they would get something for him when she got off work. 

Appellant testified that when she got home around 10:00 that evening, J.G. did not seem to be in any pain.  She applied Vaseline to his burns, changed his diaper, and put him to bed.  The next day, appellant went to work and again left the children in Zapata’s care.  The same day, she noticed that J.G. was scratching his burns, causing his skin to come off.
(footnote: 4) 

The next day, on August 21, Zapata went to work while appellant stayed home.  Appellant called Zapata at work and told him that J.G. was  getting worse and that she was going to take him to the doctor.  Zapata left work, and they took J.G. to Cook Children’s Medical Center.  Appellant testified that she had not taken J.G. to the hospital earlier because she was afraid he was going to be taken away from her. 

Child Protective Services (CPS) investigator Julie Nash testified that J.G.’s older brother, G.G., gave a different account of what happened to J.G.  She testified that G.G. told her that after appellant had gone to work on August 19, Zapata gave J.G. a bath.  G.G.  heard water running, some splashing, and J.G. saying “agua, agua.”  After J.G.’s bath, G.G. noticed that J.G.’s legs were red.  Kay Tucker, the children’s foster mother, testified that during play therapy, the therapist told J.G. to pretend that he was Zapata and that a doll was himself.  Tucker testified that J.G. pretended to force the doll into a tub of hot water while making crying noises.         

Melissa Jane Garrettson, an emergency room physician who works at Cook Children’s Medical Center, testified that on August 21, 2002, J.G. was brought to the center with second-degree burns over twenty-five percent of his body.  J.G. was in severe distress with an elevated heart rate, respiratory rate, and blood pressure.  According to Dr. Garrettson, J.G. was grunting and appeared to be in significant pain.  After determining that J.G.’s injuries were life-threatening, Dr. Garrettson arranged for him to be transferred to the burn unit at Parkland Hospital. 

Dr. Garrettson testified that appellant, who does not speak English, told a translator that she had bathed J.G. in a tub that she had recently cleaned with Clorox bleach.  However, Dr. Garrettson testified that appellant’s explanation was not consistent with J.G.’s injuries.  She testified that there were specific lines of demarcation between J.G.’s burned skin and normal skin, which indicated that J.G. had been burned by being placed in hot water rather than water containing residual Clorox bleach.  Dr. Garrettson also testified that J.G.’s buttocks were not as severely burned as his legs, which was further evidence of an immersion burn because a ceramic or plastic tub is not as hot as the surrounding water.  Dr. Garrettson testified that electrolyte and blood gas tests performed on J.G. did not indicate an acid chemical burn.  Finally, Dr. Garrettson testified that the pattern of his burns indicated that he had been trying to keep part of his body out of the water and that his injuries were the result of child abuse. 

Joshua Ernest Roller is a physician with Parkland Hospital in Dallas.  He testified that after arriving at Parkland, J.G.’s burns were cleaned with a bristle brush in order to remove as much of the dead skin and bacteria as possible.   Dr. Roller testified that this process, known as “debriding,” is very painful for patients such as J.G. who have second-degree burns because their nerve endings are exposed.  J.G. ‘s burns were debrided every day until he had his first skin graft surgery.  Ultimately, J.G. underwent two surgeries to repair the damage caused by his burns. 

Dr. Roller testified that because appellant waited two days before seeking medical treatment for J.G., she increased his risk for multisystem organ failure and sepsis, both of which could have caused his death.  Further, Dr. Roller testified that the severity of J.G.’s burns would have been obvious on the evening of August 19, 2002.  He testified that J.G. would have been in a significant amount of pain and that Vaseline would not have helped to ease his pain.  Dr. Roller pointed to the same evidence cited by Dr. Garrettson in concluding that J.G.’s burns were caused by his having been forcibly immersed in hot water. 

Dr. Roller testified that Xrays of J.G. showed fractures to his arm and collarbone that had healed.  Nash testified that appellant said that J.G. had broken his arm while he was in the care of a babysitter in Mexico.  Appellant told Nash that she initially did not know that J.G. was hurt but that she questioned the babysitter after J.G. began complaining of pain.  The babysitter told appellant that J.G. had fallen off the top of a car onto the cement.  Appellant testified that she took J.G. to see a doctor.  But because some time had elapsed since the injury, the fracture had already begun to heal and could not be treated.  Appellant could not explain how J.G. had broken his collarbone. 

The evidence indicates that on several occasions, appellant failed to seek prompt medical treatment for J.G.  On one of these occasions, appellant’s 
delay in seeking medical treatment for J.G. could have resulted in his death.  There is evidence that appellant understood or should have understood the severity of J.G.’s burns and yet chose not to take him to see a doctor because she was afraid he would be taken away from her.  Based on our review of the entire record, we conclude that the trial court could reasonably form a belief or conviction that appellant engaged in conduct that endangered her children’s physical or emotional well-being, and therefore, we hold that the evidence is factually sufficient to support the trial court’s finding.  
See
 
Tex. Fam. Code Ann.
 § 161.001(1)(E).   

Because a petitioner need establish only one of the acts or omissions enumerated under subdivision (1) of section 161.001, we need not address whether the evidence is factually sufficient to support the trial court’s finding that 
appellant knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endangered the physical or emotional well-being of her children.  
See id
. ྷ 161.001(1)(D).  Instead, we will next
 address the trial court’s finding that termination of appellant’s parental rights was in the children’s best interest.  
See id
.
 § 161.001(2). 
 

B. Best Interest
 

Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include 

(1) the desires of the child,

(2) the emotional and physical needs of the child now and in the future, 

(3) the emotional and physical danger to the child now and in the future, 

(4) the parental abilities of the individuals seeking custody, 

(5) the programs available to assist these individuals to promote the best interest of the child,

(6) the plans for the child by these individuals or by the agency seeking custody, 

(7) the stability of the home or proposed placement 

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and 

(9) any excuse for the acts or omissions of the parent. 

Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976).  These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  
C.H
., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the children.  
Id.
  On the other hand, the presence of scant evidence relevant to each 
Holley
 factor will not support such a finding.  
Id.

1. Desires of G.G. and J.G.

Tucker testified that G.G. has told her several times that he would like to go home to live with appellant.  Tucker also testified, however, that G.G. told her that he was happy staying with her.  Tucker testified that J.G. has not told her where he would like to live.  She testified that he is happy when appellant visits and is happy when he is with the Tuckers. 

2. The Emotional and Physical Needs of the Children Now and in the Future

Burns testified that J.G. has shown symptoms of attachment disorder but that his condition is improving with therapy.  Tucker testified that when J.G. first arrived at her house, he was scared to take a bath.  She testified that even now J.G. wants to touch the water as it comes out of the faucet and will not get into a tub if it already contains water.  She also testified that J.G. shows signs of being a perfectionist.  He will not wear socks if they are wrinkled and insists that his shoe laces be tied tightly.  She testified that J.G. always wants to be very clean and does not like change in his daily routine. 

Burns testified that G.G. has trouble with peer relationships, anger management, and the ability to express his feelings.  Burns testified that G.G. wants to have some amount of control over what is happening in his life and where he will be living.  He also testified that G.G.’s primary concern is stability and knowing what lies in store for him.  He testified that although G.G. assumes the role of caretaker for his younger brother, G.G. is becoming more independent.  Tucker testified that G.G. and J.G. are very close to one another, and Burns testified that everything should be done to keep the two together.   
3. The Emotional and Physical Danger to the Children Now and in the Future

As part of appellant’s service plan, TDPRS wanted appellant to accept that J.G.’s burns were not caused by
 residual Clorox bleach but were caused by Zapata’s forcibly immersing J.G. in hot water.  Shantal Sparks,  a TDPRS caseworker, testified that TDPRS was concerned that appellant would not be able to protect her children from future abuse if she did not think that abuse had occurred in the past.  Sparks also testified that she told appellant that Zapata was the  primary suspect in an investigation that was being conducted by CPS and the police department into J.G.’s injuries.  Sparks told appellant that TDPRS was concerned about returning the children to her care as long as she continued to live with Zapata and offered to help appellant with applying for housing assistance.  Appellant refused to believe that Zapata had caused J.G.’s injuries, however, and she did not leave Zapata until eight months after J.G. and G.G. were taken away from her. 

4. The Plans for the Child by these Individuals or by the Agency Seeking Custody
 

Although Kay Tucker testified that she and her husband are not currently looking to adopt G.G. and J.G., she also testified that they are very attached to the children and would be happy to keep them until they are eighteen years old.  She testified that the children are very adoptable and that several people at her church have expressed interest in adopting them.  Appellant testified that she missed several of her visits with G.G. and J.G. because she did not have money for gas or for gifts for G.G. and J.G.  But she testified that if the children were given back to her, she would “do everything that’s possible to get them to the doctor” if they needed medical attention in the future.  Appellant also testified that her brother may be able to get her a job in Phoenix.   
5. The Stability of the Home or Proposed Placement

Appellant testified that she has not had a permanent job since April  2003.  She testified that she sometimes cleans houses and gets $50 per job.  Appellant testified that she is staying with her cousin but will sometimes sleep at another cousin’s house.  Sparks testified that she has not been able to verify where appellant lives since October or November 2003.  She testified that appellant gave TDPRS the address for a cousin with whom she was supposed to be living.  But when Sparks called the cousin, the cousin told her that appellant did not live with her. 

Based on our review of the entire record, we hold that the evidence was factually sufficient to support the trial court’s finding that termination was in the children’s best interest.  We overrule appellant’s first point.  

IV. Motion to Dismiss

In her second point, appellant argues that the trial court erred by not dismissing TDPRS’s suit affecting the parent-child relationship after the statutory deadline for entering a final order passed.  Section 263.401 of the Texas Family Code requires a trial court to dismiss a suit affecting the parent-child relationship if it fails to render a final order or grant an extension on the first Monday following the anniversary date that the court appointed TDPRS as temporary managing conservator.  
Tex. Fam. Code Ann.
 § 263.401(a) (Vernon 2002); 
In re M.N.G.
, 147 S.W.3d 521, 527-28 (Tex. App.སྭFort Worth 2004, pet. denied) (op. on reh’g).  The trial court may extend this deadline for up to 180 days if it finds that continuing the appointment of the department as temporary managing conservator is in the best interest of the child.  
Id
.
 
ྷ 263.401(b).  According to section 263.402(b), however, a party who “fails to make a timely motion to dismiss the suit or to make a motion requesting the court to render a final order before the deadline for dismissal . . . waives the right to object to the court’s failure to dismiss the suit.”  
Id
. ྷ 263.402(b).

In the present case, the trial court appointed TDPRS temporary managing conservator of G.G. and J.G. on August 23, 2002.  Thus, the trial court was required to render a final order on or before August 25, 2003, the first Monday following the anniversary of the appointment.  
See id
. ྷ 263.401(a).  On June 9, 2003, the trial court granted an extension under 263.401(b), setting the new deadline for entering a final order as March 1, 2004.  Appellant’s case went to trial on February 24, 2004, and the trial court signed a final order terminating appellant’s rights on March 1, 2004. 

Appellant argues that the trial court should have set the new deadline at February 22, 2004 and erred by not dismissing the State’s suit on this date.  But appellant never filed a motion to dismiss on these grounds.  Therefore, appellant has waived her right to object to the trial court’s failure to dismiss the suit.  
See id
. ྷ 263.402(b); 
In re J.M.C.
, 109 S.W.3d 591, 595 (Tex. App.སྭFort Worth 2003, no pet.).  We overrule appellant’s second point.  

V. Conclusion

Having overruled both of appellant’s points, we affirm the trial court’s judgment.  

TERRIE LIVINGSTON

JUSTICE

PANEL B: LIVINGSTON, GARDNER, and WALKER, JJ.

DELIVERED:  May 19, 2005

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
TDPRS also named the alleged biological fathers of G.G. and J.G. in its petition.  TDPRS was unable to locate either father, however, and the trial court terminated their parental rights to G.G. and J.G. in the same order terminating appellant’s parental rights.  Neither father is a party to the appeal.   

3:
Although the injury to J.G. was the basis of the suit, appellant does not challenge the trial court’s findings as they pertain to G.G. specifically.    

4:
Appellant did not say whether she noticed J.G. scratching his burns before or after she went to work.