

**NUMBER 13-13-00392-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF M.R.G.L., ET AL., MINOR CHILDREN[1]

**On appeal from the County Court at Law No. 5
of Nueces County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Longoria
Memorandum Opinion by Justice Benavides**

This is a termination of parental rights case. By their respective issues, appellants, F.H. ("Mother"), B.D. ("Father B"), and D.H. ("Father D") challenge the trial court's order terminating their parental rights on various statutory grounds, *see generally* TEX. FAM. CODE ANN. § 161.001(1) (West Supp. 2013); and that termination was in the best interests of the children. *See id.* § 161.001(2) (West Supp. 2013). We affirm.

---

[1] M.R.G.L. ("Brother") was originally a child at issue in this case. However, Brother reached the age of majority prior to trial and was no longer subject to this termination proceeding.

## I.    BACKGROUND

The parental rights over five children are at issue in this case:  (1) M.S., age fourteen at trial, ("Child M"); (2) S.H., age ten at trial, ("Child S"); (3) E.H., age ten at trial, ("Child E"); (4) D.H., age five at trial ("Child D"); and (5) S.G., age two at trial, ("Child L").  A sixth child, M.R.G.L. ("Brother"), was originally a child at issue in this case.  However, Brother reached the age of majority prior to trial and was no longer subject to this termination proceeding.  Mother is the biological mother of all five children at issue, Father B is the biological father of Child M only, and Father D is the biological father of Child S, Child E, and Child D.  Child L's father was unknown at trial.[2]  The record shows the following:

In the late-night hours of October 11, 2010, Corpus Christi Police were dispatched to a call regarding an abandoned child, later identified as Child D, walking down the highly-trafficked Buffalo Street carrying a large bag of cereal.  Mother was eventually located by police at an apartment complex.  Police alleged that Mother had "a moderate smell of an intoxicating beverage emanating from her breath and person as well as red bloodshot eyes and slurred speech."  At trial, Mother denied being intoxicated.    Mother    was    eventually    arrested    and    charged    with    child abandonment/endangerment.  *See* TEX. PENAL CODE ANN. § 22.041 (West 2011).  Mother received deferred adjudication on this charge and was placed on community supervision for three years.

The Texas Department of Family and Protective Services ("the Department") opened  a  case  against  Mother  in  November  2010  as  a  result  of  the  child

---

[2] Child L's unknown father's parental rights were also terminated by the trial court's order.  This unknown father did not respond to citation of suit and is not a party to this appeal.

abandonment/endangerment charge and offered Mother family based services. At this point, all of the children were placed with their aunt, A.R. ("Aunt"), and a family friend. According to Angela Arredondo, one of the Department's caseworkers assigned to this case, Mother engaged in some of the services offered, but never completed them. Arredondo also testified at trial that Mother did not follow the rules regarding visitation of her children. Arredondo further indicated that Mother did not establish a residence, continued to use drugs and alcohol, and was not addressing her mental health issues. As a result, the Department was granted temporary conservatorship of the children.

Randa Lester, another Department caseworker assigned to this case, also testified.[3] Lester indicated that the trial court granted the Department temporary managing conservatorship over the children in August 2011, and a service plan was set up with Mother. The Service Plan, admitted into evidence as the Department's Exhibit 12, had several tasks for Mother to complete, including: (1) attend individual counseling, (2) take her medication, (3) follow up with the housing authority regarding housing for the family, (4) not have unsupervised visits with the children, (5) pay monthly child support, (6) comply with the Department, and (7) comply with the conditions of her probation. According to Lester, Mother's compliance with the service plan was mixed. Lester testified that Mother completed the drug assessment and was attending drug counseling; however, she did not establish a residence and did not work. Additionally, Lester noted that Mother maintained minimal contact with the Department, did not visit the children regularly, and was incarcerated.

---

[3] Lester testified that she succeeded the prior Department caseworker, Monique Miller, who did not testify at trial.

Lester testified that there is not one, single family member who is able to care for the children altogether. Instead, Lester explained that Child M and Child L are living with Aunt, and maternal grandmother, E.V. ("Maternal Grandmother"), would like Child S placed with her. Lester also testified that Brother asked to help take care of his siblings, and despite being eighteen years-old, Lester stated that Brother has "unique insight" into what the siblings are experiencing. Lester opined that it would be in the best interest to terminate all of the respective parental rights because the children "need some kind of closure, so that they know what is their permanent home." Lester also told the trial court that the Department would continue to work with the new families.

Mother testified via telephone from a long-term substance abuse treatment facility where she was incarcerated. Mother denied being intoxicated on the night that Child D was found. Despite being placed on probation, however, Mother stated that two motions to revoke were filed against her after she tested positive for alcohol, marijuana, and cocaine during her probation. Under both motions to revoke, Mother was sent to substance-abuse treatment facilities. The Department and Mother entered into three different service plans, but Mother has not completed any of them. According to Mother, she lacked one required counseling session. Additionally, Mother testified that she was unable to apply for housing because of her pending criminal charge and an unspecified balance of money that she owed. Mother admitted to having mental-health issues and stated that she was taking medicine for depression, bipolar disorder, anxiety, panic attacks, and insomnia. Mother stated that prior to being sent to the substance-abuse treatment facilities, she lived with her cousin, who did not have enough room for her because her cousin had a family of her own. Mother described Father B as a

4

cocaine user and Father D as a good provider for her family, but violent. Mother recalled stabbing Father D after a fight as an act of self-defense. Mother also stated the calls made to the Department against her were made "mostly . . . out of spite." She also indicated that she would give monetary support to the children as needed through Aunt. Finally, Mother justified her non-compliance with the Department's service plan and goals with the fact that she was "real sick mentally" and did not seek treatment.

Anna Zarling, a licensed chemical dependency counselor, also testified. Zarling testified that she counseled Mother from August 2011 through October 2011, when Mother was discharged after completing the required services. Zarling testified that based upon Mother's current incarceration in the substance abuse treatment facility, she appears to have relapsed and needs ongoing recovery and support.

Father D also testified telephonically from prison. Father D testified that he was incarcerated for domestic violence in 2008, after physically assaulting Mother's sister and punching Brother, then age 14, in the ribs. Father D testified that prior to his incarceration he sold drugs to earn a living. Father stated that although he is incarcerated, he has supported his children (Child E, Child S, and Child D) through his sister. In prison, Father D participated in a cognitive intervention program to deal with anger and stress-related problems. Father D testified that he has also attended parenting classes, college-level classes, and carpentry trade-skill classes. Father D stated that once he is released from prison, he hopes to find a job that utilizes his carpentry training. Father D also expressed a desire to re-enter his children's lives and support them. The Department entered into a service plan with Father D to which many of the conditions were contingent upon his release from prison, such as not participating

5

in further criminal activity and giving the Department access to his home environment. The plan also called for Father D to attend and complete parenting classes and individual counseling, to the extent that they were available in prison.

Father B also testified by telephone from prison. Father B discovered that he was Child M's biological father after taking a DNA test. Father B stated that the last time he had seen Child M, he was a toddler. Father B testified that he was not sure whether Child M was his son, despite dating Mother, because she "had been around." Father D testified that he was currently imprisoned for driving while intoxicated. In jail, he received his general equivalency diploma (GED) and has taken heating, venting, and air-conditioning classes. Father B admitted that he does not know Child M, and that, if asked, he could not pick Child M out of a photographic lineup. Father B testified that he was not trying to remove Child M from the family that he loves, but rather just wanted an opportunity to establish a relationship with him and let him know that he is his biological father. Like Father D, the Department entered into a service plan with Father B to which many of the conditions were contingent upon his release from prison such as not participating in further criminal activity and giving the Department access to his home environment. The plan also called for Father B to attend and complete parenting classes and individual counseling, to the extent that they were available in prison.

Licensed counselor, Vicki Lori Magana, also testified. Magana indicated that she had seen Child E, Child S, Child D, and Child L over approximately forty-three counseling sessions. Magana saw the children along with Aunt, Brother, and Maternal Grandmother. According to Magana, the goal of the counseling sessions was to assess the children and understand the "overall picture of their lives and the changes that they

6

have had" over the last few years. Magana testified that her findings revealed that: (1) Child S and Child D show "clear" symptoms of attention deficit hyperactivity disorder (ADHD); (2) Child S also has attachment issues and attachment disorder symptoms; (3) Child D appears to have attachment disorder; and (4) Child E has "grief and loss type of issues." Magana opined that most of these impressions are the result of instability in the home.

Magana indicated that Brother, who was eighteen years-old at trial, has expressed a willingness to adopt Child E and Child D. Magana testified that Brother is not a "typical" eighteen-year-old. According to Magana, Child D wakes up at night calling out for Brother. While he does not work, Brother is attending barber's college and has a two-year-old, who Child E and Child S talk about a lot. During trial, Brother was in the process of applying for two-bedroom housing. Magana opined that it was in Child E and Child D's best interest to be placed with Brother, if Aunt continues to stay involved. Magana also stated that Child S would be "fine" if placed with Maternal Grandmother, while Child M wants to reside with Aunt. According to Magana, Child L is unaware as to what is going on. Magana testified that she believed that termination of all respective parental rights would be in all of the children's best interests in order to begin the "healing" process of what has happened and what is going to happen to them.

After taking all of the evidence and arguments under advisement, the trial court ordered that Mother, Father D, and Father B's respective parental rights be terminated. Further, the trial court ordered that the Department be appointed permanent managing conservator of all of the children. The trial court allowed, among other things, post-termination contact between the children and Mother, as allowed at the "discretion and

direction" of the eventual caregivers.[4]   The trial court further ordered a placement hearing within thirty to forty days to finalize placement plans with approved caregivers, Aunt, Maternal Grandmother, and Brother.  This appeal followed.

## II.   DISCUSSION

### A.   Mother's Appeal

By four issues, which we consolidate into one, Mother challenges the legal and/or factual sufficiency of the evidence to prove that she violated one of the statutory factors listed in the family code, *see* TEX. FAM. CODE ANN. § 161.001(1), and that termination of her parental rights were in the children's best interest.   *See id.* § 161.001(2).

#### 1.  Statutory Factors

The trial court affirmatively found by clear and convincing evidence that Mother violated the following statutory factors resulting in the termination of her parental rights:

(1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, *see id.* § 161.001(1)(D);

(2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, *see id.* § 161.001(1)(E);

(3) been convicted or has been placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child under the following sections of the Penal Code or adjudicated under Title 3 for conduct that caused the death or serious injury of a child and that would constitute a violation of one of the following Penal Code sections:  § 22.041 (abandoning or endangering child), *see id.* § 161.001(1)(L)(x).

---

[4] The trial court also granted post-termination contact between Father D and Father B with their respective children in the way of two written letters per year.

8

Mother argues that the evidence is legally insufficient to support termination as to sections 161.001(1)(D) and (E) and further asserts that the evidence is legally and factually insufficient to support a finding pursuant to the factor in section 161.001(1)(L). We disagree.

We first look at whether the evidence is legally sufficient to support the trial court's finding as to sections 161.001(1)(D) and 161.001(1)(E).[5] "Endangerment" is defined as exposing to loss or injury, or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269–70 (Tex. 1996) (per curiam); *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, pet. denied). In reviewing this finding, it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *Id.* (citing *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). It is not necessary that the conduct be directed at the child or that the child suffers injury, or even that the conduct constitutes a concrete threat of injury to the child. *A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g).

The record is replete with evidence that Mother has had a lengthy battle with domestic violence and substance abuse. The record shows that Mother and Father D

---

[5] Because the evidence pertaining to sections 161.001(1)(D) and (E) is interrelated, we will conduct a consolidated review. *See In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.).

had serious domestic violence issues that went beyond their own battles. Father D admitted to physically assaulting Mother's sister and was also accused of punching then fourteen-year-old Brother in the ribs. Mother also recalled an incident in which she stabbed Father D after a fight as an act of self-defense. *See In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied) ("Domestic violence may be considered evidence of endangerment."). Magana also testified that Child S talked to her about witnessing Father D beating up Mother.

Furthermore, the record shows that this case was opened as a result of Mother allowing Child D to wander off from their residence with a bag of cereal in his hands. Police who investigated this case later found Mother and reported that she had a moderate smell of alcohol emanating from her breath and person and bloodshot eyes. As a result of this conduct, Mother was eventually arrested and charged with child abandonment/endangerment. *See* TEX. PENAL CODE ANN. § 22.041. Mother was placed on community supervision for this charge, to which the State has twice filed motions to revoke her community supervision due to Mother testing positive for alcohol, marijuana, and cocaine. On both motions to revoke, the trial court sent Mother to long-term substance abuse treatment facilities.

After reviewing the evidence in the light most favorable to the finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that findings under sections 161.001(1)(D) and 161.001(1)(E) were true. Because only one statutory ground is necessary to support a termination order, *see In re J.F.C.*, 96 S.W.3d at 261, and because the trial court properly found two grounds, it is unnecessary to discuss the remaining statutory finding. *See* TEX. R. APP. P. 47.1.

10

## 2. Best Interests of the Children

Mother argues that the evidence is legally and factually insufficient to support the trial court's finding by clear and convincing evidence that termination of her parental rights was in the children's best interests. We disagree.

Under *Holley*, the first issue considered in a best interest analysis is the desires of the child. The record shows that Child M and Child L see Aunt as their mother and Child E does not want a relationship with his mother and has expressed a desire to live with Brother, while Child D cries for his mother and Child S sometimes asks about her mother. The children's cries and occasional inquires about their mother, however, do not necessarily express a desire to return to their mother's care. To the contrary, the record shows that Child S is content under Maternal Grandmother's care and Child D wakes up at night calling out for Brother.

Next, we consider the emotional and physical needs and dangers of the child now and in the future. Magana testified that Child S and D show clear ADHD symptoms, as well as attachment disorders, while Child E is "guarded" toward outsiders and experiences "grief and loss-type issues." Child S also has dyslexia. Lester also noted that Child D exhibits a lot of "outbursts." Both Magana and Lester opined that these issues relate to the instability placed on the children as a result of these proceedings and that stability and closure were needed.

Next, we consolidate the next four *Holley* factors: parental abilities of individuals seeking custody; programs available to assist individuals to promote the best interest of the child; plans for the child by these individuals or by the agency seeking custody; and stability of the home or proposed placement. Child M and L see Aunt as their mother,

11

and the Department has indicated no concern with Aunt's abilities as a parent. Brother and Maternal Grandmother have also indicated a willingness to seek placement/custody of Child E and Child D and Child S, respectively. The Department noted that Maternal Grandmother did not pass the initial home study, but did not otherwise present any other evidence that would impair her ability to take care of Child S. The evidence, however, showed more concerns with Brother. At eighteen years-old, Brother has a young child of his own with his girlfriend, lacked a job, and did not have housing. At the time of trial, however, Brother was attending a barber's college and was in the process of applying for appropriate housing. Lester also stated that Brother had a "unique insight" into the lives of his siblings. Magana described Brother as not a "typical" eighteen year-old, but also noted that Brother needs parenting classes, which he agreed to attend. Furthermore, Magana also testified that if placement of Child E and Child D was made with Brother, he would have the support of Aunt, Maternal Grandmother, and another family friend. Further, Lester testified that the Department would continue to work with all of the family members, in a post-termination setting.

Finally, we look at the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one and any excuse for the acts or omissions of the parent. Mother testified that she was "real sick mentally" and did not seek treatment to justify her non-compliance with the Department's service plan. Mother also admitted to using alcohol, marijuana, and cocaine during her period of community supervision.

To summarize, the evidence shows that: (1) none of the children expressed a desire to live with their mother, despite Child D's cries for her and Child S's inquiries; (2)

12

the emotional and physical needs of and dangers to the children were high and stability and closure are needed; (3) placement options were available with family members, and the Department pledged to continue to work with the family members; and (4) Mother justified her non-compliance with the Department's family plan as a result of her mental health issues that went untreated, which resulted in her substance abuse.

Accordingly, after reviewing the record in the light most favorable to the finding and giving due deference to the trial court's fact findings, we conclude that the evidence is legally and factually sufficient to find that terminating Mother's parental rights was in all of the children-at-issue's best interests.

Mother's sole issue on appeal is overruled.

## B.    Father D's Appeal

By four issues, which we consolidate into one, Father D challenges the legal and factual sufficiency of the evidence related to the trial court's affirmative findings on three separate statutory violations, and that terminating his parental rights over Child E, Child S, and Child D was in their best interests.

### 1.  Statutory Factors

The trial court affirmatively found by clear and convincing evidence that Father D violated the following statutory factors resulting in the termination of his parental rights:

(1) been convicted or has been placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child under the following sections of the Penal Code or adjudicated under Title 3 for conduct that caused the death or serious injury of a child and that would constitute a violation of one of the following Penal Code sections: § 22.04 (injury to a child, elderly individual, or disabled individual), *see* TEX. FAM. CODE ANN. § 161.001(1)(L)(ix);

13

(2) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children, *see id.* § 161.001(1)(O);

(3) knowingly engaged in criminal conduct that has resulted in Father's conviction of an offense; and confinement or imprisonment and inability to care for the children for not less than two years from the date of filing the petition, *see id.* § 161.001(1)(Q).

Father argues that the trial court's findings are legally and factually insufficient. We disagree. First, we examine the evidence under the trial court's finding pursuant to sections 161.001(1)(L)(ix) and 161.001(1)(Q).[6] Father D testified that he had been incarcerated on a prison sentence of ten years since 2008 after pleading guilty in November 2008 to one count of aggravated assault with a deadly weapon, *see* TEX. PENAL CODE ANN. § 22.02 (West 2011), and injury to a child, *see id.* § 22.04. Father D admitted at trial that he had kicked and "beat[] up" Mother's sister, but appeared to deny that he punched Brother in the ribs, despite his plea of guilt. The record includes a judgment of conviction in Cause Number 08-CR-1001-H, which accurately reflects Father D's sentence for the above-referenced charges.

Section 161.001(1)(Q) is applied prospectively. In other words, the relevant inquiry here is whether Father D's conviction under penal code section 22.02 would result in his confinement or imprisonment and inability to care for Child E, Child S, and Child D for not less than two years from the date of the Department's filing of the petition. *See In re A.V.*, 113 S.W.3d 355, 359–60 (Tex. 2003). The Texas Supreme Court further explained the purpose of section 161.001(1)(Q) as follows:

---

[6] Because the evidence is interrelated between these two statutory grounds, we consolidate our review.

14

By looking at future imprisonment and inability to care for the child, subsection Q purports to protect children whose parents will be incarcerated for periods exceeding two years after termination proceedings begin. Indeed, the purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct. Although the "termination suit can result in a parent's loss of his or her legal relationship with the child," the primary focus is protecting the best interests of the child.

*Id.* at 360–61. The Department filed its petition for termination in this case on August 2, 2011. Father D acknowledged in his testimony that he would be incarcerated until 2018, when he is scheduled for release, which is beyond the two-year threshold requirement of section 161.001(1)(Q). Father D also testified that he would potentially be up for parole at the end of May 2013. However, no further evidence or proof has been provided to this Court that such a release took place. Accordingly, after reviewing the record in the light most favorable to the finding and giving due deference to the trial court's fact findings, we conclude that the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(1)(Q). Because the trial court properly found one ground, it is unnecessary to discuss the remaining statutory findings. *See* TEX. R. APP. P. 47.1.

### 2. Best Interests of the Children

Father D argues that the evidence is legally and factually insufficient to support the trial court's finding that terminating his parental rights over Child E, Child S, and Child D was in the children's best interests. We disagree.

The record is void of any evidence to show that Child E, Child S, or Child D desire to have a relationship or be placed with Father D. Furthermore, the record shows that Magana testified that Child E experiences "grief" and "loss" issues, which results in him being "very cautious" and "guarded toward outsiders." Magana also

testified that Child S and Child D experience attachment disorder symptoms. Both Magana and Lester, speaking on behalf of the Department, opined that stability and closure was necessary for the best interests of the children.

The record shows that Father D may potentially be imprisoned until 2018. Father D also testified that he has financially helped the children from prison through his sister, but he did not specify exactly how. Additionally, Father D testified that he hoped to work his way back into his children's lives following his release from prison. Lester also testified that Father D did not have any relatives who were an appropriate placement option.

While there is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship, *see In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam), the focus is on the best interest of the child. *See In re C.H.*, 89 S.W.3d at 26 ("While parental rights are of constitutional magnitude, they are not absolute."). Permanence is a paramount consideration for the child's present and future physical and emotional needs. *See In re M.D.S.*, 1 S.W.3d 190, 200 (Tex. App.—Amarillo 1999, no pet.). Therefore, in light of the record in this case, we conclude that the evidence is factually and legally sufficient to support the trial court's finding that terminating Father D's parental rights over Child E, Child S, and Child D was in the children's best interests.

We overrule Father D's issues on appeal.

**C. Father B's Appeal**

By three issues, which we consolidate into one, Father B challenges the legal and factual sufficiency of the evidence related to the trial court's affirmative findings on

three separate statutory violations, and termination of his parental rights over Child M was in the child's best interest.

### 1. Statutory Factors

The trial court affirmatively found by clear and convincing evidence that Father B violated the following statutory factors resulting in the termination of his parental rights:

(1) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children, *see id.* § 161.001(1)(O).

(2) knowingly engaged in criminal conduct that has resulted in Father's conviction of an offense; and confinement or imprisonment and inability to care for the children for not less than two years from the date of filing the petition, *see id.* § 161.001(1)(Q).

We turn first to Father B's violation of section 161.001(1)(Q). Father B argues that the evidence is factually and legally insufficient to support the trial court's affirmative finding. We disagree. The record shows that Father B entered a plea of guilty in Cause Number 10-CR-0811-G in Nueces County in June 2010 for driving while intoxicated—third offense. *See* Tex. Penal Code Ann. §§ 49.04 (West Supp. 2013), 49.09 (West 2011). The record further shows that on November 16, 2010, Father B was sentenced to twelve years' imprisonment with the Texas Department of Criminal Justice—Institutional Division.

Father B acknowledged that he was incarcerated for the enhanced driving while intoxicated charge. Additionally, Father B was hopeful that he would be paroled in November 2013, and, if not, in 2014 because he had completed a "quarter" of his sentence. We note that no further evidence or proof has been provided to this Court

17

that such a release took place, or will take place in the future. Even assuming that Father B would be released in 2014, "parole decisions are inherently speculative, and while inmates doubtlessly hope for early release and can take positive steps to improve their odds, the decision rests entirely with the parole board's discretion." *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2003) (internal citations omitted). Further, "if the mere possibility of parole prevents a factfinder from ever forming a firm belief or conviction that a parent will remain incarcerated for at least two years, the party seeking termination would have to show that there is zero chance of early release beyond a reasonable doubt." *Id.*

As indicated earlier, the Department filed its petition for termination in this case on August 2, 2011. The record shows that Father B could potentially be imprisoned until 2022. Accordingly, after reviewing the record in the light most favorable to the finding and giving due deference to the trial court's fact findings, we conclude that the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(1)(Q). Because the trial court properly found one ground, it is unnecessary to discuss the remaining statutory finding. *See* TEX. R. APP. P. 47.1.

### 2. Best Interest of the Child

Father B argues that the evidence is legally and factually insufficient to support the trial court's finding that terminating his parental rights over Child M was in the child's best interests. We, again, disagree.

The record shows that Father B recently entered Child M's life, after a DNA test revealed him to be Child M's biological father. Father B testified that Mother told him that there was a possibility that he could be Child M's biological father, but Father B did

not think he was, since Mother named Child M after one of Father B's friends. Due to this recent discovery, coupled with Father B's incarceration, he has no relationship with Child M. Father B admitted that he has not seen Child M since he was a toddler, and would not be able to identify him if he was asked to do so today.

Despite his incarceration, Father B testified that family members were available and willing to establish a relationship with Child M. However, the Department's caseworker, Lester, testified that Child M does not want any contact with Father B's family. Lester also noted that due to his incarceration, Father B would not be able to provide a home for Child M.

Therefore, in light of this record, we conclude that the trial court had legally and factually sufficient evidence to find that terminating Father B's parental rights over Child M was in the child's best interest.

Father B's sole issue is overruled.

### III. CONCLUSION

We affirm the trial court's order of termination.

_____
GINA BENAVIDES
Justice

Delivered and filed the
9th day of January, 2014.