# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

NO. 03-14-00392-CV

---

**D. F. and B. W., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE COUNTY COURT AT LAW OF BASTROP COUNTY
NO. 13-15978, HONORABLE BENTON ESKEW, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Based on jury findings, the trial court terminated the parental rights of appellants D.F. and B.W. to their daughter, J.F. Appellants contend that termination of their parental rights is not in J.F.'s best interest. We will affirm the judgment terminating appellants' parental rights.

## BACKGROUND

On June 27, 2013, the Texas Department of Family and Protective Services investigated a report that a neighbor saw four-year-old J.F. urinating and defecating in the street. Investigators from the Department and the Bastrop County Sheriff's Department testified regarding the conditions they found at appellants' home. The Department's investigator testified that she found broken toys, electronics, and vehicle parts strewn around the yard, a pool with green water, and piles of trash. Inside the house, there was trash on the floor and counters and overflowing from trash bags, as well as moldy food in the sink, the refrigerator, and throughout the house. They found

stacks of items at least five feet tall that the Department's investigator said she feared could have toppled and injured the child. She also testified that she found loaded firearms with the safety on but within the child's reach. She testified that J.F. was dirty, did not respond to questions intelligibly, and seemed behind developmentally. The deputy testified that he would not allow his children to stay in the house in that condition for any amount of money. The investigators took pictures that the Department later showed to the jury.

The Department's investigator testified that appellants seemed unconcerned by the condition of their home even though their daughter had been previously removed from the home because of its condition. The Department's investigator said that appellants told her that the clutter comprised salvaged items that they intended to sell at flea markets to obtain income needed to supplement their disability income payments. The mother, B.W., testified that she suffered from muscular dystrophy and multiple sclerosis, while the father, D.F., testified that he had cardiac issues that resulted in implantation of an arterial stent. The Department and appellants agreed to move J.F. to a nearby relative while appellants cleaned their house.

Medical examinations of J.F. revealed unexplained bruises on her back, buttocks, and legs, as well as concerns about possible sexual abuse. A nurse who examined the child noted clefts in the child's anus and hymen, but testified that she could not determine whether the clefts were due to sexual abuse. She said that such injuries were not common. J.F., however, did not make an outcry regarding sexual abuse. A pediatrician who reviewed the records testified that some of the bruises were linear, which was inconsistent with accidental bruising. Several witnesses testified that many of the child's teeth were decayed. The dentist who treated J.F. had previously examined her when the Department intervened in 2011. He testified that J.F. had only two cavities in 2011

2

along with some suspicious areas and was set for follow-up treatment, but appellants did not follow through with that treatment plan. The dentist testified that, when he examined her after the Department intervened in 2013, the child had several cavities, some of which were deep enough to be plainly visible and to have almost reached the nerve of the tooth. He said that the structure of several teeth had "gone to mush" that he scooped out. He sealed those teeth and put crowns on six of eight back teeth that the child will need until they are replaced by adult teeth starting from about ages ten through twelve. Although the parents testified that they did not follow up with dental care in 2011 because they could not find another dentist who accepted their insurance, the dentist who treated the child said he believed that his office accepted almost every type of insurance and that his office would "do the right thing" for a child who presented serious dental health problems.

Service providers who worked with appellants testified that the parents attended, but did not seem to accept, the services offered. The psychologist who examined the couple testified that they both scored at least twice as high as normal for deceptive responses. He said that the father, D.F., responded so deceptively on one test that it invalidated the results of another test. He said that the father was nonresponsive about the Department's reasons for intervening. The psychologist said that the mother, B.W., appeared anxious and could not provide her understanding of the details of the Department's reasons for intervening. He testified that B.W.'s history of witnessing and experiencing assaults as a child left her with low self-esteem and a tendency to avoid conflict that would make her less able to protect a child. The counselor who conducted the parenting class and individual therapy described D.F. as defensive and flippant. He said that D.F. did not accept responsibility for any of the concerns for the child's condition and safety other than the clutter in the house. The counselor testified that B.W. was less combative but also admitted only that the

3

house was cluttered. The counselor said that B.W. denied that food in the refrigerator was moldy and seemed not to know why she was having to participate in the services. Another counselor, who taught B.W. and D.F. a basic parenting class, testified that B.W. participated minimally but to the best of her ability. This counselor testified that she was concerned by B.W.'s unkempt and unclean appearance. The counselor said that D.F. tried to copy off of B.W.'s test paper. The counselor—who testified that she owns guns, is licensed to carry a concealed weapon, and understands that Texas law prohibits guns being freely accessible to minors—said that D.F. downplayed any problem with his gun storage practices.

The foster mother[1] testified that J.F. had improved during the year she stayed with her. She described the family's home as having mold and a smell that was "very gruesome, very nauseating" and said that D.F. terrified her. She said that J.F. typically smelled like she had rolled in dog feces and that, when the Department intervened, J.F. had a soiled diaper and matted hair. The foster mother testified that J.F. was emotional, violent, cussing, hitting, biting, and kicking when she came to live with her and that J.F. initially lashed out at children walking down the hall in school. The foster mother also testified that her daughter modeled potty training for the four-year-old J.F., which succeeded until J.F. visited with appellants in February 2014, after which she regressed to needing a pull-up diaper. The foster mother testified that the February 2014 visit with appellants

---

[1] Trial witnesses used the term "foster" to refer to the relative placement, and we will use that term for convenience.

The foster mother testified that D.F. is her husband's uncle, meaning that the witness's husband is J.F.'s cousin.

4

upset J.F. because they told her that they had Christmas presents waiting for her at their nearby home. J.F. thereafter tried to go to her parents' nearby home.

J.F.'s caseworker testified that the child's condition had improved remarkably since removal. She testified that the Department did not allow visitation with appellants until February 2014 because medical evidence hinted at sexual assault. She acknowledged that J.F. never made an outcry even after becoming "chatty." The caseworker reiterated the foster mother's claim that potty training became an issue after parental visitation began and that J.F. was obsessed with the Christmas presents waiting for her. The parents eventually brought some of the presents to the child. The caseworker testified that the parents cleaned up the house, moving trash to where it could be picked up gradually. She testified that, although the parents enrolled in the required classes and participated in the required evaluations, they resisted the service plan at every step. They did not ask how the child was doing in school. The caseworker said that appellants pose a danger because of their denial of problems. Although they had fixed the home clutter and safety issues that prompted intervention by the Department in 2011, they allowed them to get as bad or worse again.

The court-appointed special advocate testified that J.F. was skinny, friendly, aggressive, and had speech issues and delayed motor skills. She testified that the placement with the foster mother was good and that J.F. was now no longer attacking other children as she had before. The CASA volunteer testified that she took pictures outside appellants' home the week of the June 2014 trial and saw trash on the front porch and yard, items with sharp points, other items that a child could climb inside and get stuck in, and stacks of items that could fall on a child.

J.F.'s pre-school classroom aide testified that the child improved over the course of the year while in foster care. She testified that J.F. occasionally appeared at school unkempt and

5

smelling of urine even while in foster care. The aide said that J.F.'s foster mother was very involved in J.F.'s schooling.

B.W. testified that appellants had done all they were supposed to do to regain custody of J.F. She said they had cleaned the house and that she would not let its condition deteriorate again. She said that it deteriorated after the 2011 intervention when they started going through their stored items. She said that she has muscular dystrophy and multiple sclerosis. She testified that they kept garbage in the house temporarily because they had no garbage removal service and dogs would scatter garbage left outside. She said that she was not aware of moldy food in the house. She did not think that she needed to attend counseling, but had attended as required. She has had her rights terminated to two other children, one because the child had special needs that exceeded her capabilities and the other, she said, because the judge was in a bad mood about an unrelated case. Both live with relatives.

D.F. testified that he had agreed to terminate his rights to two older children because he was then homeless and his marriage was untenable. He testified that they waited to get the dental treatment recommended for J.F. in 2011 because they wanted a second opinion but had trouble finding another provider who accepted their insurance. He testified that the incident that prompted the neighbor's report occurred when J.F. was riding her bicycle on the street. Although he was watching her, the child stopped and defecated in the street before he could stop her. He said he corrected her afterwards. D.F. testified that the photos shown to the jury showed no hazards to the child. He described their house as cluttered, but not unsanitary or filthy. He said that the child was not allowed into the more cluttered rooms and did not play in the cluttered parts of the yard. He said that the allegations of moldy food were fabricated and that J.F. never tried to touch his guns. He

6

testified that their house is now much cleaner and that his only remaining gun has a complicated safety and is stored much higher than before. He testified that the only difference between pictures of J.F. at the time of trial and on the day she was removed is that her hair was brushed in the more recent picture.

Appellants' friends testified that appellants fed and cared for the child and that J.F. was happy and active. One friend testified that he had no concerns for J.F.'s safety and that she seemed fine. Another testified, however, that he had not been to the house for two years and would not eat there based on the pictures of the house taken on the day that J.F. was removed.

Appellants raised some concerns about J.F.'s treatment while in foster care. Once, she exhibited a mark indicating that she might have been spanked with a belt. The Department's investigation concluded only that the foster mother was not responsible. The other concern arose from the posting of photos of the child on the internet. The foster mother admitted posting the photos, but said she did not realize that she was not supposed to do so.

The child did not testify and no statements from her were introduced into evidence.

The trial court asked the jury whether each parent's rights should be terminated. The question incorporated both the grounds for termination[2] and the best interest of the child. The jury answered "yes" as to both parents' rights. Appellants challenge only the finding that termination of their parental rights is in the child's best interest.

---

[2] The grounds submitted for the jury's consideration were whether each parent had (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being and/or (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being. Tex. Fam. Code § 161.001(1)(D), (E).

## PRESERVATION OF ERROR

The Department argues that appellants failed to preserve their sole issue for appellate review. Appellants did not respond to this argument. Appellants' assertion that termination is not in their child's best interest takes the form of a challenge to the sufficiency of the evidence. To preserve a challenge to the legal sufficiency of evidence in a jury trial, a party must either (1) file a motion for instructed verdict, (2) file a motion for judgment notwithstanding the verdict, (3) object to the submission of the issue to the jury, (4) file a motion to disregard the jury's answer to a vital fact issue, or (5) file a motion for new trial. *See In re D.J.J.*, 178 S.W.3d 424, 426-27 (Tex. App.—Fort Worth 2005, no pet.); *see also T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992). To preserve a factual-sufficiency challenge for appeal, a party must file a motion for new trial. *D.J.J.*, 178 S.W.3d at 427; *see also* Tex. R. Civ. P. 324(b)(2). No such motions appear in the record. Appellants have not preserved their sole appellate complaint.

Because of the importance of the rights involved, we will nevertheless review the sufficiency of the evidence in the interest of justice.

## STANDARD OF REVIEW

A trial court can order termination of a parent-child relationship only if the trial court finds by clear and convincing evidence that the parent has committed one of several acts or omissions that are grounds for termination and that termination is in the child's best interest. *See* Tex. Fam. Code § 161.001. Appellants do not challenge the jury's implicit finding of the grounds for termination. *See id.* § 161.001(1). Their appeal focuses on the second prong of the test—the child's best interest.

There is a strong presumption that the best interest of a child is served by keeping custody in the natural parent. *In re D.T.*, 34 S.W.3d 625, 641 (Tex. App.—Fort Worth 2000, pet. denied). There are a number of factors that may be considered.[3] We review the record to determine if clear and convincing evidence supports the judgment, which means that a factfinder could form a firm belief or conviction about the truth of the State's allegations. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 266-67 (Tex. 2002). In the legal-sufficiency review, we examine the evidence in the light most favorable to the finding of best interest, assuming that the factfinder resolved disputed facts in favor of the finding and disregarded non-credible evidence if it could do both reasonably. *J.F.C.*, 96 S.W.3d at 266. In the factual-sufficiency review, we must decide in light of the entire record whether the factfinder could reasonably have formed a firm belief or conviction that termination was in the child's best interest. *Id.* at 266-67.

**DISCUSSION**

The record contains clear and convincing evidence of key factors used to assess whether termination of the parental relationship is in the child's best interest. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). We will focus on the emotional and physical danger to the

---

[3] Factors often used to evaluate the best interest of a child include: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). This list of relevant considerations is not exhaustive, and the Department is not required to prove that all of the listed factors support termination. *See id.*; *In re C.H.*, 89 S.W.3d 17, 27-28 (Tex. 2002).

child now and in the future, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, any excuse for the acts or omissions of the parent, and the plans for the child by these individuals or by the agency seeking custody, as well as the stability of the home or proposed placement.

Some aspects of the child's environment and physical condition when she was removed from her parents' care support a finding that appellants' parental rights presented a danger to the child's physical health then and in the future. These aspects include the recurrence and worsening of problems that led to intervention in 2011. The Department cited the danger from clutter in the house in 2011 and, after examining the child, discovered two dental cavities that needed treatment. The parents cleaned up the house and the child was returned to them with a recommendation for dental treatment. Two years later, however, the clutter had returned in reportedly dangerous quantity and arrangement. The clutter was augmented this time by moldy food and loaded firearms within the child's reach. The child's dental health had declined precipitously, with reports of several teeth incurring cavities and loss of structural integrity of teeth that she likely would need for several more years. The child also suffered unexplained bruises and injuries indicating possible sexual assault, although the four-year-old child never reported any such assault. The recurrence and worsening of the reportedly dangerous clutter and dental neglect issues, coupled with the parents' reported resistance to their skills training and counseling, raise serious questions about their ability to meet those and other challenges in J.F.'s future.

The conditions in and around the house and the state of J.F.'s dental health also cast doubt on the propriety of the parents' relationship with the child. The parents' awareness that the

child had dental issues that needed treatment, their failure to follow through in obtaining the necessary care, and their seeming unawareness of the significant deterioration of their daughter's dental health encapsulate concerns about their ability to care for the child properly. The parents' financial challenges and their personal health issues explain some of their difficulties, but do not excuse the full range of dangers to which they exposed their child and to which they might continue to expose her.

Reports of J.F.'s development under her parents' care are conflicting. Friends described her as happy and active. The investigators who made the original visit to the home in 2013, however, described her as developmentally delayed and barely intelligible. There was conflicting evidence regarding whether she was potty trained, though it was not disputed that most children are potty trained by age four. Her pre-kindergarten teacher described her as a sassy, funny, and typical child who made normal progress while in foster care.

The only evidence is that appellants will not benefit from services provided to help them. They attended required parenting classes, but did not believe that they needed them and did not appear to retain the information provided. The foster mother, by contrast, called the caseworker often to discuss the child.

Evidence supported a conclusion that the Department's plan to leave the child with the current foster placement, possibly resulting in adoption, is appropriate. J.F. reportedly has improved physically and behaviorally while in foster care. There is some cause for concern regarding the unexplained mark indicating spanking with a belt by somebody other than the foster mother, but there is no indication that it recurred. The caseworker reported that the foster mother

11

calls her often and a teacher's aide at J.F.'s school described the foster mother as very caring, involved, and accessible.

We conclude that sufficient evidence supports the jury's finding by clear and convincing evidence that termination of appellants' parental rights is in J.F.'s best interests.

## CONCLUSION

Having found that appellants' sole issue was not preserved and lacks merit, we affirm the judgment.

_____

Jeff Rose, Justice

Before Chief Justice Jones, Justices Rose and Goodwin

Affirmed

Filed:   September 25, 2014